[No. D017139. Fourth Dist., Div. One. Jan. 23, 1995.]

DEL ORO HILLS, Plaintiff and Appellant, v.
CITY OF OCEANSIDE, Defendant and Respondent.

**COUNSEL**

Worley, Schwartz, Garfield & Rice and Donald R. Worley for Plaintiff and Appellant.

Myers, Widder & Gibson, Freilich, Stone, Leitner & Carlisle, Katherine E. Stone, J. Roger Myers, Brown, Diven & Hentschke, Brown, Harper, Burns & Hentschke and Daniel S. Hentschke for Defendant and Respondent.

Christi Hogan, City Attorney (Malibu), as Amicus Curiae.

**OPINION**

**HUFFMAN, Acting P. J.**—The initial questions posed by this appeal as to the validity of a residential growth control initiative, chapter 32A of the City of Oceanside Municipal Code, commonly known as Proposition A (Prop. A), adopted by the voters of the respondent City of Oceanside (the City), were answered by this court in our opinion filed July 19, 1994, in *Building Industry Assn.* (also referred to as BIA) v. *City of Oceanside* (1994) 27 Cal.App.4th 744 [33 Cal.Rptr.2d 137] (hereafter *Building Industry II* or the BIA opinion). In the BIA matter, with which this case was consolidated, the City obtained judgment in its favor in a three-phase court trial on BIA's complaint as to the validity of Prop. A. We reversed that judgment because under the standards set by *Lesher Communications, Inc.* v. *City of Walnut Creek* (1990) 52 Cal.3d 531 [277 Cal.Rptr. 1, 802 P.2d 317] (*Lesher*), Prop.

A is facially, and as applied, in conflict with the City's general plan and with state planning and zoning law. (Gov. Code, § 65000 et seq.)[1] We thus found that initiative measure invalid from its adoption date.

This appeal by Del Oro Hills, a partnership (Del Oro), of summary adjudication and judgment entered against it in its companion and consolidated action against the City, raises additional questions as to the viability of its claims for damages in light of the constitutional prohibition against governmental regulatory takings without just compensation. Del Oro also claimed breach of an implied-in-fact agreement with the City not to interfere with the timing of its development, violation of its vested rights to proceed with development, and denial of equal protection of the law due to the City's exemption from Prop. A of an allegedly similarly situated developer.

Although we found in our BIA opinion that Prop. A could not stand because it was in conflict with the City's general plan and statutory provisions, we do not find that conclusion mandates a finding here that Prop. A also violates constitutional rights so as to constitute a per se taking of private property. Instead, we conclude that Del Oro has failed to show Prop. A promotes no legitimate state purpose and would thus be facially invalid under takings standards. In addition, Del Oro has failed to show any valid "as-applied" challenge to Prop. A because it did not exhaust administrative remedies to obtain a final determination on a specific development plan. The other issues raised by Del Oro (equal protection violations and impairment of implied contract or vested rights) are also unmeritorious. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Because Del Oro's action was consolidated with the BIA action for trial of the issues on the validity of Prop. A, an understanding of the BIA proceedings is necessary for an analysis of Del Oro's contentions on this appeal. We therefore quote from our BIA opinion, which in turn quotes from a prior opinion of this court (*Building Industry Assn.* v. *Superior Court* (1989) 211 Cal.App.3d 277 [259 Cal.Rptr. 325] [hereafter *Building Industry I* or the prior opinion]), which arose out of our review of an order denying cross-summary judgment/adjudication motions in the BIA matter.

1. *History of Prop. A*

"Our [*Building Industry I*] opinion contains the following summary of the adoption and content of Prop. A, alternatively referred to as Chapter 32A:

" 'Ch. 32A, adopted by the Oceanside electorate in April 1987, declares one of its purposes is "to augment the policies of the City as recorded in the

---

[1]All statutory references are to the Government Code unless otherwise specified.

General Plan and City ordinances relating to the regulation of residential development," and "[i]n order to accomplish this purpose, the City must be able to control the rate, distribution, quality and economic level of proposed development on a year to year basis." Ch. 32A adopts a "Residential Development Control System" (RDCS) which, with what may be significant exceptions, adopts a maximum number of dwelling units to be constructed each year, called annual allotments. The allotments are 1,000 for 1987 and 800 for each year thereafter until December 31, 1999, with power granted to the City Council to modify the annual allotment by an amount no greater than 10 percent more or less for any given year and a requirement the annual allotment for a next succeeding year be adjusted higher or lower in order to redress any excess or deficit in the preceding year. Excepted from the RDCS are the following: "(a) Projects of not more than four residential dwellings, limited to only one such project per developer per calendar year.

" ' "(b) Fourplexes or less numbered multiple dwellings on a single existing lot.

" ' "(c) Single family residential units on a single existing lot.

" ' "(d) Rehabilitation or remodeling of an existing dwelling, or conversion of apartments to condominiums, so long as no additional dwelling units are created.

" ' "(e) Units within the legally designated redevelopment project area.

" ' "(f) Those specific Units which are formally dedicated for occupancy by low income persons or senior citizens pursuant to the provisions of applicable federal, state, or local laws or programs provided these types of units are spread equitably throughout the city and not concentrated in one neighborhood. For the purposes of this section, a project is funded or subsidized pursuant to applicable federal, state or local laws or programs if it receives a loan, grant or continuing financial subsidy for the purpose of developing low-income or senior citizen housing units. This section does not exempt low income or senior citizen projects built with density bonuses or other development considerations under any program.

" ' "(g) Single family dwelling unit projects with lots an average of which are 10,000 square feet or better, which can achieve a minimum of 70% or better, of the maximum awardable points using the Residential Development Evaluation System are exempt."

" 'Ch. 32A, in addition, provides for application, evaluation and award of development allotments which must be granted before a building permit may be issued.' (*Building Industry [I]*, *supra*, 211 Cal.App.3d at pp. 285-286.)

"Under Prop. A, projects are reviewed by a 'Residential Development Evaluation Board' (the Board) made up of members of the City's planning commission, who evaluate proposed projects for their impact upon public facilities and services (the 'A' criteria) and site and architectural quality (the 'B' criteria). A project which does not receive a score of 51 percent on the 'A' criteria and 70 percent on the 'B' criteria is eliminated from consideration for an annual allocation. The Board's recommendations are forwarded to the city council, which makes the annual allocations." (*Building Industry II, supra*, 27 Cal.App.4th at pp. 749-750, fn. omitted.)

## 2. *BIA and Del Oro File Their Actions*

"Shortly after Prop. A was adopted, BIA and 10 developers [including Del Oro] sued the City under several theories contending Prop. A was invalid on its face, seeking declaratory and injunctive relief.[2] After the trial court denied cross-motions for summary judgment and summary adjudication, its order was upheld by this court in our prior opinion. We concluded that invalidity of a growth control ordinance 'can be established only by determining facts bearing on whether the enactment truly conflicts with state law and its purposes.' (*Building Industry [I], supra*, 211 Cal.App.3d at p. 290.) We stated that whether the regional housing needs as established by SANDAG [San Diego Association of Governments] will be met by the City was a question of material fact that awaited proof. (*Id.* at p. 293.) We explained that some factual determinations by the trial court would of necessity have to be projections of the reasonable probability of accommodating regional housing requirements in future housing periods. (*Id.* at p. 294.) We were unable to establish the validity of any of BIA's various asserted conflicts between Prop. A and state law 'without reference to established facts.' (*Ibid.*) We further found that there was present no clear invalidity of Prop. A due to inconsistency with the City's general plan, on the basis that 'factual determinations need to be made before the question of inconsistency can be resolved.' (*Id.* at p. 297.)" (*Building Industry II, supra*, 27 Cal.App.3d at pp. 752-753, original fns. omitted.)

## 3. *Consolidated Trial Proceedings*

In accordance with the prior opinion, the trial court scheduled trial of the BIA lawsuit, and consolidated Del Oro issues, in three phases. Phase I addressed the issues raised by Evidence Code section 669.5, subdivision (a), as to whether the City had successfully rebutted the statutory presumption

---

[2]Nine of the ten developers dismissed their actions; Del Oro, the remaining one, pursued its action in consolidation with the BIA action. Appeal in another related action, *Cromwell Ranch v. City of Oceanside* (D019020, app. pending), is pending in this court.

that Prop. A was "presumed to have an impact on the supply of residential units available in an area which includes territory outside the jurisdiction of the city. . . ." (Evid. Code, § 669.5, subd. (a).)[3] In phase II of the trial, under Evidence Code section 669.5, subdivision (b), the City had the burden of proof to show that Prop. A was "necessary for the protection of the public health, safety, or welfare of the population of the [C]ity, . . ." (*Ibid.*) The court set forth as the appropriate "balancing test" for phase II:

" 'The City has the burden of proof by the preponderance of the evidence that (1) there are real and substantial "problems relating to its police power to protect public health, safety and welfare of its population" (either present or reasonably anticipated), and (2) that the ordinance or initiative in question is reasonably related to and designed to remedy the identified public health, safety and welfare problems.

" 'The Court must then balance the above two factors against the quantified adverse effects which the ordinance will have upon the need for public housing including affordable housing in the region.' (Fn. omitted.)" (*Building Industry II*, *supra*, 27 Cal.App.4th at pp. 754-755.) The court further noted that the more impact Prop. A was proven to have upon public housing, including affordability, the more substantial the police power justification must be to balance the competing interests. (*Id.* at p. 755.)

To summarize briefly for present purposes, the trial court ruled in favor of BIA in phase I of the trial, finding that the City had not rebutted the presumption under Evidence Code section 669.5, subdivision (a) that Prop. A would have an impact on the supply of affordable residential units in the region. In phase II, however, the City prevailed, the trial court finding that Prop. A represented a reasonable accommodation of the competing interests.

Phase III of the trial was based on the evidence from phases I and II, and presented the issues of whether Prop. A conflicted with the public facilities and management element (PFME) of the City's general plan, or three specified Government Code sections: section 65008, subdivision (c) (prohibiting discrimination against low income housing); section 65913.1 (establishing appropriate standards for zoning to contribute to the economic feasibility of producing the lowest possible cost housing); or section 65915

---

[3]In pertinent part, Evidence Code section 669.5, subdivision (a) reads: "Any ordinance enacted by the governing body of a city . . . which (1) directly limits, by number, the building permits that may be issued for residential construction or the buildable lots that may be developed for residential purposes, or (2) changes the standards of residential development on vacant land so that the governing body's zoning is rendered in violation of Section 65913.1 of the Government Code is presumed to have an impact on the supply of residential units available in an area which includes territory outside the jurisdiction of the city . . . ."

(the density bonus law intended to encourage low income housing). The trial court took the matter under submission and ruled in phase III in favor of the City on all issues, finding no invalidity of Prop. A because of any conflict with the City's general plan (specifically, the PFME), or any conflict with the density bonus provisions of section 65915, or the low income housing law of sections 65008, subdivision (c), and 65913.1.

After judgment was entered accordingly against BIA (and was timely appealed, resulting in our *Building Industry II* opinion), further proceedings as to Del Oro were severed for trial.

### 4. *Del Oro Factual Background*

The facts on which this action was based were as follows: Del Oro is a partnership which acquired a 300-acre parcel of property in the City and obtained City approval of a master tentative subdivision map on the property. The planning commission resolution of approval for this master tentative map states, among other things: "1. That the Tentative Map is for financing and land management purposes. The approval of the map does not grant any development rights because under the Del Oro Hills Specific Plan, further public hearings on Development Plans and/or Tentative Maps will be required prior to development."

The project buildout was proposed to be over a five-year period. Del Oro then obtained approval of a specific plan and planned residential development master plan for its development, a proposed complex of a series of smaller residential neighborhoods or villages. The villages were not themselves building sites, as each of them would be sold to another developer for building after Del Oro prepared the infrastructure for the property.

Before the developer could build its village as purchased from Del Oro, it needed to obtain additional approvals for a final master tentative tract map, tentative and final subdivision tract maps and development plans, all relevant grading permits and landscape plans, and building permits.

In December 1985, Del Oro and the City entered into improvement agreements, and Del Oro recorded its master final subdivision map in February 1986. Del Oro then obtained construction financing and bonds for its improvement plans to commence the grading and subdivision improvements called for in the subdivision map and other City approvals. Del Oro contracted with a construction company to grade and install storm drains, sewer, water, utilities, and street improvements in the development area. Del Oro entered into contracts to sell several of its villages, conditioned on completion of subdivision improvements before close of escrow. Some of these contracts were pending when Prop. A was proposed and adopted.

A month after Prop. A passed, Del Oro's attorney wrote a letter to the city attorney requesting an exemption from the effects of Prop. A on Del Oro's property, on the theory it had an implied-in-fact development agreement with the City. This request was denied. Del Oro alleges that when Prop. A was proposed, from that point on, it became practically impossible to market its property. A number of escrows were cancelled and, under business necessity and with its lender's approval, Del Oro later sold four of the villages to one of its constituent partners, Robinhood Homes, Inc. The price, $7.5 million, was $1.5 million below a tentative agreement that was reached to sell the property before Prop. A came on the scene. Other buyers closed their escrows for some of the villages in the latter part of 1987, but Del Oro had to make some $700,000 in concessions to keep the escrows going after Prop. A passed.[4]

Building permits had been issued for 371 of the planned 1,200 units before Prop. A was adopted. Within three and one-half years after Prop. A was adopted, the developers of Del Oro's villages received allocations or exceptions under Prop. A for all of the units necessary to complete the twelve hundred-unit project. Del Oro never applied to build under the low-income exception. Del Oro sold all of its villages within a two-year time frame.

Before Prop. A was adopted, an unrelated developer based in the City, Rancho Del Oro (Rancho), entered into a development agreement with the City to develop 4,840 residential units over a 10-year period. (§ 65864 et seq., covering development agreements.) Because of this development agreement, the City exempted Rancho from the effect of Prop. A. Del Oro had no such formal development agreement, although it claimed an implied agreement of the sort existed.

In its complaint, Del Oro sought declaratory and injunctive relief that Prop. A was invalid, and an award of monetary damages on theories of (1) unconstitutional taking of its property, in violation of federal civil rights (42 U.S.C. § 1983), (2) denial of equal protection due to the City's exemption from Prop. A of Rancho, an allegedly similarly situated developer, and (3) breach of an implied-in-fact agreement with the City not to interfere with the timing of its development or wrongful denial of a vested rights exemption from Prop. A. As noted above, the issues of validity of Prop. A were resolved in the BIA action, and along with the BIA judgment, an order was

---

[4]These two sets of losses form the main basis of Del Oro's damages claims.

entered resolving the causes of action raising those issues in the Del Oro action.[5]

### 5. *City's Motion for Summary Judgment or Adjudication of the Del Oro Action*

After the BIA action was resolved, the City sought summary judgment on Del Oro's claims for damages under its vested rights or federal civil rights theories. (Code Civ. Proc., § 437c.) The motion was denied except for one reserved issue of equal protection, and the City sought writ relief in this court to set aside the denial of the motion. We denied the writ. (*Oceanside* v. *Superior Court* (Jan. 12, 1989) D009124 [nonpub. opn.].)

The City's motion was renewed and ultimately granted in its favor. The order first recited that Prop. A had been found valid in the BIA trial, and that ruling applied in the Del Oro case; in addition, Del Oro was not pursuing a number of its other theories. (See fn. 5, *ante*.) On the federal civil rights claims, the trial court ruled no constitutional claim of taking of property could be made because Prop. A substantially advanced a legitimate governmental purpose, and Del Oro had not been deprived of substantially all economically viable use of its property. (*Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141] (*Nollan*).) In addition, the takings claims were deemed not ripe for lack of a meaningful development application, and also barred for lack of pursuit of administrative remedies. The court found the equal protection claim failed because there was a rational basis for the different treatment received by Del Oro and Rancho. The vested rights and implied contract claims were found moot, as the property was sold and all development permits granted, and in any case meritless due to inability of the government to contract away its right to exercise police power in the future. (*Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785, 800 [132 Cal.Rptr. 386, 553 P.2d 546].)

Del Oro timely appealed. The appeal was consolidated with the BIA appeal up through oral argument, but severed for decision and for purposes of obtaining supplemental briefing. (Order of July 6, 1994.)

---

[5]Del Oro brought seventeen causes of action against the City, but by the time of the summary adjudication motion leading to the judgment we review, was only pursuing seven of them: five on implied contract or covenant or vested rights theories; one for equal protection violations; and one for federal civil rights damages. As noted above, the two causes of action claiming Prop. A was invalid, facially and as applied, were resolved against Del Oro when BIA was resolved. Among the causes of action Del Oro abandoned was one for inverse condemnation under federal and state provisions for "exactions" of the cost of the improvements Del Oro had made at the property.

## DISCUSSION

In our BIA opinion, the issue presented was whether, in light of facts relating to the local entity's compliance with its obligation to meet its share of regional housing needs, there was conflict between Prop. A, a numerical growth control ordinance, and state law or the entity's general plan. (*Building Industry I, supra*, 211 Cal.App.3d at p. 284.) We applied the doctrine of law of the case and the rules announced in *Lesher* to the facts found and established by the trial court, and concluded that Prop. A was invalid when passed because it conflicted with state law as of the time of its adoption, and it is further invalid because it is inconsistent with policies established by the City's general plan. (*Lesher, supra*, 52 Cal.3d at pp. 540-541, 544-545, 547; *Building Industry II, supra*, 27 Cal.App.4th at pp. 766-772.)[6] We found that taken together, the three cited Government Code sections (§ 65008, subd. (c), prohibiting discrimination against low-income housing; § 65913.1, requiring that zoning standards contribute to the economic feasibility of producing the lowest possible cost housing; and § 65915, establishing density bonus incentives for low-income housing development) clearly show an important state policy to promote the construction of low-income housing and to remove impediments to the same. The terms of the City's general plan were also inconsistent with those of Prop. A. We accordingly reversed the BIA judgment with directions to enter a different judgment in accordance with the principles of that opinion. That analysis is incorporated herein as if fully set forth, due to the consolidation at the trial level of the Prop. A validity issues as to both BIA and Del Oro.

After oral argument was held in the consolidated BIA/Del Oro appeals, we severed the matters for decision and obtained supplemental briefing from Del Oro and the City; in addition, the City attorney of Malibu, as amicus curiae on behalf of the League of California Cities has submitted supplemental briefing. (Cal. Rules of Court, rule 14(b).) As this appeal was originally briefed, Del Oro claimed the trial court erred in granting summary judgment in light of Del Oro's theory that the enforcement of Prop. A resulted in an unconstitutional taking of property. Del Oro further argued that triable issues of material fact remain as to its claim of entitlement to damages for violation of its equal protection rights, due to the exemption of another developer, Rancho, from the effects of Prop. A because of its development agreement with the City. Finally, Del Oro argued that triable issues exist as to whether Del Oro should have been entitled to an exemption from the effect of Prop. A on an implied contract or vested rights theory.

---

[6]In *Lesher*, the Supreme Court held that the growth control initiative before it regulated land use, on its face, and as such was equivalent to a zoning ordinance. (*Lesher, supra*, 52 Cal.3d at p. 541.) Here, the parties do not dispute that Prop. A is in the nature of a zoning ordinance.

While these issues still remain before this court, supplemental briefing has focused the "takings" issue on the following points: Under the applicable tests, does an invalid regulation create damage per se, or is something more required to show a taking, such as loss of all economically beneficial use that was substantially caused by the governmental entity's activities? Also, how does Del Oro's status as essentially a wholesaler of land, rather than an on-site developer, affect its claim that Prop. A applied directly to it and caused it loss? Was exhaustion of remedies required as to such a plaintiff, regarding facial or as-applied claims of unconstitutionality? Finally, is this case suitable for summary disposition as having an adequately developed record? With all these issues in mind, we first address the takings claim and then the alternative damages theories: equal protection and vested or implied contract rights.

## I

### *"Takings" Claims: Inverse Condemnation*

■■■ Does the invalidity of Prop. A, due to its impermissible conflicts with state planning and zoning law and the City's general plan (*Building Industry II, supra,* 27 Cal.App.4th at pp. 766-772), mean that Prop. A does not substantially advance legitimate state interests, and its enactment accomplished some kind of per se taking of Del Oro's property interests? To answer this question we must set forth the applicable taking tests, discuss the nature of Del Oro's challenges to Prop. A, and decide if, as a matter of law, the trial court properly determined that no such taking occurred here.[7]

### A

### *Agins Test*

■■■ "The general rule, at least, is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." (*Pennsylvania Coal Co.* v. *Mahon* (1922) 260 U.S. 393, 415 [67 L.Ed. 322, 326, 43 S.Ct. 158, 28 A.L.R. 1321].) In *Agins* v. *Tiburon* (1980) 447 U.S. 255, 260-261 [65 L.Ed.2d 106, 111-112, 100 S.Ct. 2138] (*Agins*), the United States Supreme Court outlined the following two-pronged test for regulatory takings: "The application of a general zoning law to particular property

---

[7]On review of summary judgment, an appellate court examines the facts presented to the trial judge and determines their effect as a matter of law. (*Stratton* v. *First Nat. Life Ins. Co.* (1989) 210 Cal.App.3d 1071, 1083 [258 Cal.Rptr. 721].) "We also conduct independent review of the trial court's determination of questions of law. We are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale. [Citation.]" (*Ibid.*)

effects a taking if the ordinance does not substantially advance legitimate state interests [citation], *or* denies an owner economically viable use of his land, [citation]. The determination that governmental action constitutes a taking is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest. Although no precise rule determines when property has been taken, [citation], the question necessarily requires a weighing of private and public interests." (Italics added.)

In *Nollan, supra,* 483 U.S. 825, the Supreme Court relied on the *Agins* test, but stated it in the conjunctive: "We have long recognized that land-use regulation does not effect a taking if it 'substantially advance[s] legitimate state interests' and does not 'den[y] an owner economically viable use of his land,' [citing *Agins*]." (*Nollan, supra,* at p. 834 [97 L.Ed.2d at p. 687].) The court further refined the first part of the *Agins* test to explain that there must be a nexus between the conditions that the government sought to impose on the development before it could proceed and the governmental interest that the regulation seeks to further. (*Nollan, supra,* at pp. 834-837 [97 L.Ed.2d at pp. 687-689].) The regulation must substantially advance the state interest said to justify it; a finding that the regulation has a "rational basis" is not enough. (*Surfside Colony, Ltd.* v. *California Coastal Com.* (1991) 226 Cal.App.3d 1260, 1270 [277 Cal.Rptr. 371].)[8]

In *Dolan* v. *City of Tigard* (1994) 512 U.S. \_\_, \_\_ [129 L.Ed.2d 304, 315-316, 114 S.Ct. 2309, 2316] (*Dolan*), the Supreme Court reiterated the *Agins* test, but stated it in the negative and the conjunctive: "A land use regulation does not effect a taking if it 'substantially advance[s] legitimate state interests' and does not 'den[y] an owner economically viable use of his land.' [Citation, fn. omitted.]"[9] In all of these formulations, the focus of both parts of the test is on whether property has been taken without just

---

[8]The Ninth Circuit Court of Appeals, as well as the California Court of Appeal for the First District, Division Three, has rejected the argument that the *Nollan* "substantial advancement" test applies to regulatory, as opposed to possessory, takings. (*Commercial Builders* v. *Sacramento* (9th Cir. 1991) 941 F.2d 872, 874 ; *Blue Jeans Equities West* v. *City and County of San Francisco* (1992) 3 Cal.App.4th 164, 171 [4 Cal.Rptr.2d 114].) However, we need not decide this issue because we do not deal with a particular imposed permit condition, but rather with an overall growth control scheme; in addition, as we shall show, only facial challenges to the regulation are properly presented here.

[9]See discussion in *First English Evangelical Lutheran Church* v. *County of Los Angeles* (1989) 210 Cal.App.3d 1353, 1365-1367 [258 Cal.Rptr. 893] (*First English II*) (on remand from United States Supreme Court, *sub nom. First Lutheran Church* v. *Los Angeles County* (1987) 482 U.S. 304 [96 L.Ed.2d 250, 107 S.Ct. 2378]), of the question of whether the two elements of the *Agins* test are "either/or" in nature or if establishment of one part of the test will suffice to show a taking; the court did not have to decide that issue as the ordinance under discussion survived either test. (210 Cal.App.3d at p. 1367.)

compensation, not on whether a regulation is in the abstract an invalid one; the inquiry must be what effect the regulation has on affected property owners.[10]

■ In general, growth control ordinances are routinely upheld by federal and state courts as valid exercises of a municipality's police power. (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 602 [135 Cal.Rptr. 41, 557 P.2d 473]; *Construction Ind. Ass'n, Sonoma Co.* v. *City of Petaluma* (9th Cir. 1975) 522 F.2d 897; *Long Beach Equities, Inc.* v. *County of Ventura* (1991) 231 Cal.App.3d 1016, 1030 [282 Cal.Rptr. 877].) Such regulations are normally upheld if they bear a "substantial relationship to the public welfare" and inflict no irreparable injury on landowners. (*Id.* at p. 1030.) A substantial diminution in value of property is not irreparable injury in this context. (*Ibid.*)

■ Moreover, because Prop. A was a growth control regulation, it is entitled to some deference in constitutional analysis, regardless of its statutory or general plan infirmities. ■ Thus, "the type of taking alleged is also an often critical factor. It is well settled that a ' "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, [citation], than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.' [Citation.]" (*Keystone Bituminous Coal Assn.* v. *DeBenedictis* (1987) 480 U.S. 470, 488-489, fn. 18 [94 L.Ed.2d 472, 490-491, 107 S.Ct. 1232].)

■ In this case, the City's version of such an ordinance was fatally flawed because of its conflict with related statutory provisions and the applicable general plan. In our *Building Industry II* opinion, however, we were not presented with and did not decide any constitutional challenges to Prop. A; the matter was presented as requiring resolution of conflicting legislative provisions, and Prop. A lost. To decide if this invalidity is of constitutional dimension so as to support takings claims, we must look at the nature of the challenges Del Oro brought against the measure.

B

*Facial Versus As-applied Challenges: the Rules*

At the outset of this discussion, we dispose of the City's claim in its supplemental briefing that the issue of Prop. A's validity is not adequately

---

[10]To state a cause of action for inverse condemnation, a landowner must allege not only ownership of the property, but also the governmental entity's taking or damaging of property, and substantial damage to property rights that was substantially caused by the entity's conduct. (*Stoney Creek Orchards* v. *State of California* (1970) 12 Cal.App.3d 903, 906-907 [91 Cal.Rptr. 139]; 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 641, pp. 91-92.)

presented here because the Del Oro complaint, unlike the BIA complaint, does not cite to section 65008, subdivision (c), prohibiting discrimination against low-income housing; section 65913.1, requiring that zoning standards contribute to the economic feasibility of producing the lowest possible cost housing; or section 65915, establishing density bonus incentives for low income housing development. The Del Oro action was consolidated with the BIA action for trial of the validity issues, and the trial court dismissed Del Oro's two causes of action claiming invalidity of the ordinance (facial and as applied) based on its BIA ruling. The issue was and is central to the Del Oro proceedings.

■ Next, the distinction between facial challenges to regulation and "as-applied" challenges has several aspects. Neither type of challenge, however, can avoid analysis of both prongs of the *Agins* test. (See *First English II*, *supra*, 210 Cal.App.3d at pp. 1365-1367.) Generally, a facial challenge presents an issue of law and case-specific factual inquiry is not required. Thus, in *Gilbert* v. *City of Cambridge* (1st Cir. 1991) 932 F.2d 51, 55-56, it is explained that a plaintiff may challenge a regulation as unconstitutional on its face by demonstrating that the mere enactment of the law constituted a taking without just compensation, i.e., by denying the owner economically viable use of the land. In *Lucas* v. *So. Carolina Coastal Council* (1992) 505 U.S. __, __ [120 L.Ed.2d 798, 812, 112 S.Ct. 2886, 2893] (*Lucas*), the court described two categories of regulatory action which were compensable without case-specific inquiry into the public interest said to support the regulation. These were (1) where the property owner suffers physical invasion of the property, and (2) where the regulation denies all economically beneficial or productive use of the land. (*Ibid.*)

However, an ordinance is safe from a facial challenge if it preserves, through a permit procedure or otherwise, some economically viable use of the property. (*Gilbert* v. *City of Cambridge*, *supra*, 932 F.2d at p. 57.) In such a case, administrative remedies must be pursued if available because the challenge is actually an "as-applied" one. (*Ibid.*) In short, there is also a third category of regulatory takings, where some restrictions burden the property, but the owner is left with some possibility of a beneficial or productive use, so that a case-specific inquiry may be needed to determine if a taking has occurred. (*Lucas*, *supra*, 505 U.S. at p. __ [120 L.Ed.2d at p. 812, 112 S.Ct. at p. 2893]; *Tahoe Keys Property Owners' Assn.* v. *State Water Resources Control Bd.* (1994) 23 Cal.App.4th 1459, 1474-1477 [28 Cal.Rptr.2d 734].)

In *Hensler* v. *City of Glendale* (1994) 8 Cal.4th 1, 8, fn. 2, 9-13 [32 Cal.Rptr.2d 244, 876 P.2d 1043], the Supreme Court took a strict approach

to requiring exhaustion of administrative remedies as a prerequisite to challenging a land use ordinance as an uncompensated taking of property. The court held that in challenging a regulatory taking, an owner must afford the governmental entity the opportunity to rescind the regulation or exempt the property from the restriction, by means of a facial challenge through a declaratory relief action, the seeking of a variance if available, and then the exhaustion of other administrative and judicial remedies. (*Id.* at pp. 13-14, 26.)

## C

### *Application of Rules: No "As-Applied" Challenge*

■ To attack regulation as applied, the plaintiff must show a meaningful application for approval of the project was denied, as was any subsequent application for a variance or other permit. "Informal or tentative development proposals are insufficient to meet these tests. [Citation.]" (*Long Beach Equities, Inc.* v. *County of Ventura, supra*, 231 Cal.App.3d at pp. 1032-1033.)
■ Here, Del Oro made a letter request, referring to an earlier claim, that it be exempted entirely from the scope of Prop. A; that request was denied.

Analysis of the exhaustion of remedies issue is complicated by Del Oro's status as an intermediary type of developer. It was not to be the ultimate developer of housing on the land, and was thus not in the usual position of a developer seeking building permits. It could, however, have sought approval of tentative subdivision maps and allocations or other specific ruling under Prop. A; it did not. Under the settled rules for property owners, it is evident that Del Oro has failed to perfect an "as-applied" challenge because it did not apply for permits or allocations to develop the property or seek a variance of some type, other than complete exemption. We are reluctant to create a new category of wholesaler of land or intermediary who is exempt from the requirement of exhaustion of administrative and judicial remedies, based solely on Del Oro's timing argument that it lost profits due to the growth control restrictions which allegedly impeded a timely sale of its property. Del Oro's as-applied claim must be deemed barred for lack of exhaustion of administrative remedies. (*Hensler* v. *City of Glendale, supra*, 8 Cal.4th at pp. 12-19.)

However, to the extent this is a facial challenge to the constitutionality of Prop. A, through the medium of the cause of action for violation of federal civil rights (42 U.S.C. § 1983), there is no bar of exhaustion of administrative remedies. (*Yee* v. *Escondido* (1992) 503 U.S. 519, 534-535 [118 L.Ed.2d 153, 169-170, 112 S.Ct. 1522, 1532].) Del Oro attacks here the "whole

regime" Prop. A imposed on properties in the City, and claims that the ordinance in its entirety does not substantially advance legitimate state interests "no matter how it is applied." (*Ibid.*)

Moreover, we do not believe *Hensler* v. *City of Glendale, supra,* 8 Cal.4th 1, precludes Del Oro's facial challenge to Prop. A. The prior opinion in this case (*Building Industry I, supra,* 211 Cal.App.3d at pp. 297-298) denied the writs so that the matter would proceed to trial, and it was never contemplated that the facial validity issue could not be addressed without any exhaustion of administrative remedies. If the *Hensler* rule were to be held retroactive in this case, it would undermine the reasonable reliance of the parties on the previously existing state of the law, as established by *Building Industry I.* (*Laird* v. *Blacker* (1992) 2 Cal.4th 606, 620 [7 Cal.Rptr.2d 550, 828 P.2d 691].) The City conceded in its original respondent's brief, "Judicial inquiry is limited to a determination of whether Prop. A on its face denies Del Oro all economically viable use of its property, or fails to substantially advance any legitimate public interest. [Citations.]" (Italics deleted.)

As the Supreme Court held in *State of California* v. *Superior Court* (1974) 12 Cal.3d 237, 250-251 [115 Cal.Rptr. 497, 524 P.2d 1281], a party need not raise challenges to the constitutionality of a statutory measure before an administrative agency operating pursuant to that measure, as a condition of raising that issue in the courts. Further, even though Prop. A did not ultimately affect the eventual use of Del Oro's land, Del Oro is still attempting to challenge the overall manner in which it affected the timing of development, to Del Oro's alleged detriment. Under all the circumstances, no exhaustion of remedies was required to preserve these arguments as to the facial validity of Prop. A.[11]

## D

### *Facial Challenge Cognizable: Theory*

Having determined Del Oro's facial attack on Prop. A is cognizable, we outline its theory and first point out what is not in dispute.[12] Prop. A does not affect the nature of the use of Del Oro's property, as Del Oro admits that its property remains zoned and specifically planned as it was in 1986, before

---

[11]It should be noted that Del Oro's requests for declaratory relief that its property could be developed free of the restrictions of Prop. A are clearly moot at this point. Moreover, it does not now seek damages for any pre-adoption effects of the proposal of Prop. A.

[12]On this point, Del Oro first argues that summary judgment is not appropriate for the issue of deprivation of all economically viable use of property, on the theory that the state of the law in this case is unsettled and factual issues abound. However, since Del Oro is attempting to make a facial challenge to the measure, it must make its showing as a matter of law, as

Prop. A was introduced. Instead, Prop. A allegedly interfered only with the timing of development. Del Oro contends, "Prop. A threw a 'monkey-wrench' into the *timing* of a *time-crucial* cycle from which DEL ORO could not extricate itself. Because Prop. A rendered it impossible to market all the Villages on time in a conventional market, DEL ORO was forced to sell its Villages at about $2 Million less than if Prop. A had not come along, and further because of Prop. A, DEL ORO was 'over a barrel' and had to make additional concessions to its buyers which lost DEL ORO hundreds of thousands of dollars."

However, Del Oro does not dispute that it sold all its property within its own time frame and it or its buyers received permits to develop all the property for residential use within five years of the 1987 adoption of Prop. A. Del Oro's damages claims are thus based upon its lost profits, which it blames on Prop. A's interference with its projected timing of its land development deals. It argues, "In the bundle of rights which constituted Del Oro's property, the only 'stick' which had any value or meaning to Del Oro in mid-1987 was the right to *sell* its property. Only a sale, and a quick one at that, would save Del Oro and its principals from financial ruin. Oceanside drastically impaired that right with Prop. A." Del Oro theorizes, "reasonable *profit* expectations, backed by investment, are protected against governmental destruction by the Fifth Amendment just compensation clause."

E

*Was There Any Taking Due to the Mere Enactment of Prop. A?*

There are several problems with Del Oro's attempt to show that, as a matter of law, a taking of property occurred here. First, we cannot accept Del Oro's theory that satisfaction of one element of the *Agins* test (i.e., that there was an invalid regulation) is enough to establish a taking as a matter of law. In *Nollan*, *Lucas*, and *Dolan*, the United States Supreme Court's analysis of the taking issue inextricably interlinked both the regulation's validity and the question of whether any economically beneficial use of the property remained in light of the regulation. In light of later authority, *Agins* did not establish an "either/or" type of test.

Next, it is well established that "[m]ere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are 'incidents of ownership. They cannot be considered as a "taking" in the constitutional sense.' [Citations]." (*Agins* v. *Tiburon, supra,* 447 U.S. at p.

suggested in *Lucas, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 812, 112 S.Ct. at pp. 2886, 2893].

263, fn. 9 [65 L.Ed.2d at pp. 113-114] [discussing whether precondemnation activities by a city constitute a taking].)[13] Similarly, although the Supreme Court in *First Lutheran Church* v. *Los Angeles County, supra,* 482 U.S. at pages 319-320 [96 L.Ed.2d at pages 266-267], held that property owners must be compensated for takings that occurred during the effective period of a regulation that was later struck down as violative of the Fifth Amendment ("temporary takings"), a determination must first be made that the regulation accomplished a taking. (See *First English II, supra,* 210 Cal.App.3d 1353 [there was no taking, so no remedy in damages].)

On a similar point, Del Oro claims it is entitled to at least nominal damages for a per se constitutional violation of its property rights. (*Memphis Community School Dist.* v. *Stachura* (1986) 477 U.S. 299, 308, fn. 11 [91 L.Ed.2d 249, 260, 106 S.Ct. 2537].) However, as we have suggested above, the statutory and other infirmities found in Prop. A do not convert it into an unconstitutional taking of property on the undisputed facts here. An invalid regulation is not necessarily an unconstitutional one. (*Moore* v. *City of Costa Mesa* (9th Cir. 1989) 886 F.2d 260; see *Keystone Bituminous Coal Assn.* v. *DeBenedictis, supra,* 480 U.S. at pp. 488-489, fn. 18 [94 L.Ed.2d at pp. 490-491]: " ' "[A] taking may more readily be found when the interference with property can be characterized as a physical invasion by government, [citation], than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." ' [Citation.]") The only available remedy for Del Oro is invalidation of the ordinance, as has already been adjudicated in our *Building Industry II* opinion. (See *Moore* v. *City of Costa Mesa, supra,* 886 F.2d 260.)

This record shows that Del Oro was essentially engaged in speculation in land development. Although it complains Prop. A was solely responsible for its inability to sell some of its 13 villages for as much as it sought, or exactly when it sought, market forces cannot be ignored in analyzing causation of loss or damage here. ▮ The courts have been unsympathetic to such claims of lost value of property. Even though the meaning of the concept of deprivation of substantially all economically viable use of property is somewhat elusive, ". . . the general rule is that 'the existence of permissible uses determines whether a development restriction denies a property holder the economically viable use of its property.' [Citation.] [¶] The denial of the highest and best use does not constitute an unconstitutional taking of the

[13]Although the court in *First Lutheran Church* v. *Los Angeles County, supra,* 482 U.S. at pages 319-320 [96 L.Ed.2d at pages 266-267], discussed this holding in *Agins,* and interpreted it to mean "that the valuation of property which has been taken must be calculated as of the time of the taking, and that depreciation in value of the property by reason of preliminary activity is not chargeable to the government," *Agins* was not disapproved or overruled by later Supreme Court authority on this point.

property. [Citation.] Even where there is a very substantial diminution in the value of land, there is no taking. [Citations.] The burden of proof is on the applicant, who faces an uphill battle. [Citation.]" (*Long Beach Equities, Inc. v. County of Ventura, supra,* 231 Cal.App.3d at p. 1036.)[14] In any case, the undisputed facts showed that this property was eventually sold and used for the same purpose which had been planned all along, i.e., residential development. It should also be recalled that Del Oro does not now seek compensation for exactions, i.e., the cost of improvements the City required it to make at the property. Del Oro cannot show any facial invalidity of the ordinance due to any deprivation of all economically beneficial use of the property. (*Lucas, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 812, 112 S.Ct. at p. 2893].)

In conclusion, this record is adequate to resolve the facial challenges to Prop. A and the takings issues as a matter of law. Accordingly, the trial court did not err in granting summary adjudication and judgment on the takings claim.

## II

### Equal Protection

 Del Oro's claims of entitlement to damages due to violation of its right of equal protection may be disposed of summarily. Del Oro argues that there is no rational basis to distinguish between Rancho, a developer that entered into a development agreement with the City, and itself, as a developer without such an agreement but which also made substantial expenditures in constructing subdivision improvements on its property. Del Oro's theory is that whatever rights Rancho's development agreement provided it, the agreement did not protect it against timing controls such as were imposed by Prop. A, and thus should not have been used to distinguish between the two developers for purposes of applying Prop. A (§ 65866, governing development agreements).

---

[14]In its reply brief, Del Oro suggests that *Lucas v. So. Carolina Coastal Council, supra,* 505 U.S. at page __ [120 L.Ed.2d at page 806, 112 S.Ct. at page 2888], undermines any rule that a mere diminution in value equals no taking. *Lucas* is distinguishable on its facts as involving a taking which deprived the landowner of all economically beneficial use of land, even though that deprivation turned out to be temporary (the subject regulation was amended to permit applications for variances; *id.* at pp. __-__ [120 L.Ed.2d at pp. 807-810, 112 S.Ct. at pp. 2889-2891].) Moreover, the Supreme Court majority opinion recognized that there are some arbitrary aspects of the "deprivation of all economically beneficial use" rule, and that in some cases, a landowner with 95 percent loss of use will recover nothing in inverse condemnation, while a landowner with a total loss will be compensated in full. The majority observed without undue concern, "Takings law is full of these 'all-or-nothing' situations." (*Id.* at p. __, fn. 8 [120 L.Ed.2d at p. 815, 112 S.Ct. at p. 2895].)

"Absent the allegation of the invasion of fundamental rights or the existence of a suspect classification, there is no violation of equal protection unless the classification bears no rational relationship to a legitimate state interest. [Citations.] This is true even if some discrimination is alleged. [Citation.]" (*Long Beach Equities, Inc.* v. *County of Ventura, supra,* 231 Cal.App.3d at p. 1041.) In our view, the existence of the development agreement provides a rational basis to distinguish between these two developers for purposes of determining whether any vested rights to development had accrued before Prop. A went into effect. The purpose of Rancho's development agreement was to protect it from changes made by subsequent land use regulations regarding uses and densities. Certainly, those were the main focus of Prop. A, even though timing controls were used to promote those purposes. No triable issues remain as to any damages claimed by Del Oro for denial of equal protection under these circumstances.

### III

*Vested Rights/Implied Contract Theories*

■ Finally, Del Oro claims it should be considered to have an implied-in-fact development agreement with the City, due to its construction of subdivision improvements on its property pursuant to agreement with the City, such that vested rights arose.[15] Damages are sought for the denial of a vested rights exemption from the effects of Prop. A. In finding these claims unmeritorious, the trial court relied on the authority of *Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785, 800 [132 Cal.Rptr. 386, 553 P.2d 546] for the proposition that the City cannot contract away its police power. The main issue in analyzing a vested rights question is whether any further approvals are contemplated before development rights vest. A promise such as that implied by a building permit is necessary before vested rights may accrue. (*Consaul* v. *City of San Diego* (1992) 6 Cal.App.4th 1781, 1800 [8 Cal.Rptr.2d 762].) In this case, the master tentative subdivision map approved by the City was not a final discretionary approval. The planning commission resolution states that the tentative map is made for financing and land management purposes, and further public hearings were required to be held on development plans and/or tentative maps before any development rights matured under the tentative map.

---

[15]Although the City contends that Del Oro's claims were not ripe for decision by the trial court, Del Oro's first amended complaint alleges that it sought an exemption under Prop. A which was denied. Also, a claim for damages for the denial of a vested rights exemption was pled in the complaint. To this extent, these damages claims were properly before the court (in contrast to the takings claims where Del Oro failed to pursue any administrative remedies so as to create a ripe takings claim and where Del Oro did not pursue its takings claim for the "exactions," i.e., the improvements at the site).

In the alternative, Del Oro pleads that equitable estoppel should prevent application of Prop. A to its project. It contends there were implied promises by City officials that the proposed use would not be prohibited by regulations, and Del Oro reasonably relied on these promises to its detriment, by constructing the improvements on the property. We fail to see how any reasonable reliance on implied promises was possible in light of the express statement in the planning commission's resolution approving the master tentative subdivision map to the effect that the approval did not grant any development rights because further public hearings on development plans and/or tentative maps would be required. There was no express representation by the government that this property would be exempt from future regulations governing the timing of development. Summary adjudication and judgment as to this claim were proper.

### DISPOSITION

The judgment is affirmed.

Froehlich, J., concurred. Nares, J., concurred in the result.

Appellant's petition for review by the Supreme Court was denied April 20, 1995. Mosk, J., and Arabian, J., were of the opinion that the petition should be granted.