[No. A076279. First Dist., Div. Five. Mar. 13, 1998.]

MILAGRA RIDGE PARTNERS, LTD., Plaintiff and Appellant, v.
CITY OF PACIFICA et al., Defendants and Respondents.

**COUNSEL**

Bianchi, Engel, Keegin & Talkington, Albert Bianchi, Jeffrey S. Schoppert and Wendy L. Wyse for Plaintiff and Appellant.

Pacific Legal Foundation, James S. Burling and Eric Grant as Amici Curiae on behalf of Plaintiff and Appellant.

McDonough, Holland & Allen and Michelle Marchetta Kenyon for Defendants and Respondents.

Shute, Mihaly & Weinberger, Ellison Folk and Susannah French as Amici Curiae on behalf of Defendants and Respondents.

OPINION

**HANING, J.**—Appellant Milagra Ridge Partners, Ltd. (Milagra), appeals a summary judgment in favor of respondents City of Pacifica and City Council of the City of Pacifica (collectively, City) in its action for inverse condemnation, declaratory relief, and writ of mandate. Milagra contends the trial court erred in concluding the City was entitled to judgment as a matter of law because the action was not ripe for adjudication. We affirm.

BACKGROUND

In or about 1979 or 1980, Milagra purchased an unimproved hillside parcel of approximately 45 acres (the Property) in the City of Pacifica for development purposes.

In July 1980 the City adopted Resolution No. 46-80, a general plan that designated the Property variously as greenbelt, commercial, and low and high density residential.

In September 1983 the City adopted Resolution No. 58-83 to amend the housing, seismic safety and safety elements of the general plan ·and to announce a resolution of intention to amend the general plan's land use element. The resolution states that the amendments are to incorporate changes in City service capacity and land capability to accommodate new residential and commercial development, and that "such changes and circumstances by their existence warrant a reassessment of: [¶] (1) The City's ability to meet the housing needs of its [existing] residents and those of the region; [¶] (2) The capability of land to accommodate new residential development on hillside and bluff top properties in a manner which preserves and enhances the public health [and] safety and protects the City's open space resources[;] and [¶] (3) The capacity of the City's infrastructure to accommodate additional residential and commercial growth . . . ." The resolution also states that "open space resources are essential to the City's ability to promote its scenic attributes thereby attracting new commercial development."

In March 1985 an application was filed to develop 144 townhouse units on the Property. The named applicant was R. Scott Bonds. Neither the record nor the parties explain Bonds's relationship to Milagra.

In May 1985 the City adopted Resolution No. 28-85 reiterating its intention to amend the land use element of the general plan. The resolution adopted the designations for vacant hillside parcels in the land use element

as the City's first priority for review, and directed the City's planning staff to conduct such a review.

In November 1985 the City adopted Resolution No. 65-85 announcing its intention to amend the land use element of the general plan and the zoning ordinance affecting vacant hillside properties. The resolution specifically identifies the Property as an area to be affected by these amendments.

In May 1986 the City's planning commission certified the environmental impact report (EIR) for the proposed townhouse development on the Property. It simultaneously denied the application for the development on the grounds it would have an adverse visual/aesthetic impact on ridgeline protection, was inconsistent with the general plan's goal of minimizing grading on the ridgeline and protecting natural landforms, was inconsistent with the City's subdivision ordinance regarding minimum lot size and grading criteria, and would have an adverse impact on traffic.

In June 1986 the City unanimously affirmed the planning commission's decision to deny the townhouse development application.

In July 1986 the City adopted Ordinance No. 468-86, an urgency ordinance to regulate certain uses within vacant hillside areas. The purpose of the ordinance was to limit hillside development pending the review of the general plan. The ordinance included the "contemplated" amendments to the general plan and mandated that no use permits would issue unless the proposed use complied therewith. Under the contemplated amendments, the general plan designation and zoning of the Property would be commercial on its lower plateau portion, very low density residential on its middle slopes, and greenbelt on its uppermost portion.

In July 1988, in Resolution No. 45-88, the City permanently adopted the July 1986 "contemplated" amendments. The final amendments also state that the Property should be planned as a unit, and that the Hillside Preservation District overlay zone, which applies to the entire Property, provides additional regulations to address the sensitivity of the site and general plan goals. The Pacifica Open Space Task Force Report (report), prepared for the City in 1988, identifies the Property as a "good candidate" for inclusion in the Golden Gate National Recreation Area. (Rep., at p. 28.) The report also notes that "overlay zones" are an effective open space preservation technique. It defines "overlay zone" as a "zoning category which is applied in addition to the basic zoning designation. [It] can be used for view protection, historical preservation or other special purposes. In Pacifica, the Hillside Preservation District (HPD) is an overlay zone which is relevant to open space preservation because it limits development in hillside areas." (Rep., at p. 46.)

In May 1989 the City's planning administrator informed a general partner for Milagra that under Hillside Preservation District regulations, approximately 4.98 acres of the Property were allowed to be disturbed by building, paving, and grading.

In 1989 the City adopted an ordinance allowing the transfer of development rights between various parcels within the City and providing for compensation as a part of the process. The Property was excluded from the ordinance.

In January 1994 Milagra filed an application to develop 64 single-family residential units on 66 lots on the Property. The proposed development was inconsistent with the general plan's very low density designation of the Property and therefore included a request for a general plan amendment.

In December 1994 the planning commission approved development permits for 63 units on 66 lots. The commission recommended that the City approve a general plan amendment redesignating the Property from commercial and very low density residential to low density residential.

In February 1995, over citizen opposition to the project, the City unanimously approved Resolution No. 13-95, the general plan amendment, and denied the opponents' appeal of the Planning Commission's permit approval. The resolution states that the City "has determined that residential development of the property, as proposed, is more appropriate than commercial development [and] . . . will have less impact on and will be more consistent with the residential development to the north of the [P]roperty than commercial development . . . ." The resolution also states that the final EIR for the project found no significant impacts resulting from the proposed development and general plan amendment.

In March 1995 opponents of the project filed a referendum petition protesting the general plan amendment.

In April 1995 the City approved Resolution No. 17-95 submitting the matter to the electorate.

In July 1995 a special election was held on measure A, which states: " 'Shall City Council Resolution No. 13-95, which will amend the Pacifica

General Plan designation from "Commercial and Very Low Density Residential" to "Low Density Residential" and amend the General Plan land use element narrative for [the Property] be approved?' " (City Res. No. 17-95.) The argument against measure A states: "Measure A will allow construction of a major housing development on a highly visible ridge line. . . . [¶] This election is *not* about growth versus no-growth. The project is just too big. A much smaller project would be within zoning guidelines . . . . [¶] The . . . variance granted by the City approximately *triples the site coverage allowed by [the Hillside Preservation District]*. . . . [¶] . . . [¶] The . . . project will have numerous substandard lots. . . . [¶] Pacificans have repeatedly voted to protect our hillsides. Send another clear message to City Hall. We do not want to relax city guidelines and ordinances to accommodate housing developments. We do not want increased traffic without a current solution. We do not want to amend the General Plan. Correct a bad decision. Vote 'No' on Measure A." (Argument against Measure A, Pacifica Special Mun. Elec. (July 11, 1995), original emphasis changed to italics.) The electorate rejected measure A.

In September 1995, two months after the defeat of measure A, Milagra filed the instant action against the City for inverse condemnation, declaratory relief, and writ of mandate ordering the City to issue to it "all necessary permits and entitlements for an economically beneficial and productive use of the subject property." As ultimately amended, the cause of action for inverse condemnation alleges that the City's acts constituted an appropriation of Milagra's valuable property rights by the City. The cause of action for declaratory relief seeks a determination whether the City's acts constituted a temporary or total taking for which Milagra is entitled to compensation. The three causes of action for writ of mandate (one under Code Civ. Proc., § 1094.5, one under § 1085, and one without any statutory reference) all generally allege that the City's wrongful conduct in denying approval of the project deprived Milagra of all economic use of the Property and thus constituted a taking without just compensation, in violation of the state and federal Constitutions.

The City's demurrer to the mandate causes of action was sustained without leave to amend. It then moved for summary judgment on the remaining causes, on grounds of ripeness, statute of limitations and Milagra's inability to demonstrate a denial of all economically viable use of the property, which is a requisite for a taking claim. The trial court concluded the City was entitled to judgment as a matter of law because Milagra's claim was not ripe for adjudication.

DISCUSSION

I

■ Milagra contends its taking claim is ripe for adjudication because the City has conclusively determined the extent to which it can develop the Property.

■ To determine whether an unconstitutional taking has occurred, California courts are guided by decisions of the United States Supreme Court. (See, e.g., *Del Oro Hills* v. *City of Oceanside* (1995) 31 Cal.App.4th 1060, 1073-1075 [37 Cal.Rptr.2d 677] (*Del Oro*); *Guinnane* v. *City and County of San Francisco* (1987) 197 Cal.App.3d 862, 867-870 [241 Cal.Rptr. 787].)

The United States Supreme Court has observed that in resolving taking claims based on land use regulations, "no precise rule determines when property has been taken," but "the question necessarily requires a weighing of private and public interests." (*Agins* v. *Tiburon* (1980) 447 U.S. 255, 260-261 [100 S.Ct. 2138, 2141, 65 L.Ed.2d 106] (*Agins*).) Later cases have recited the statement from *Pennsylvania Coal Co.* v. *Mahon* (1922) 260 U.S. 393, 415 [43 S.Ct. 158, 160, 67 L.Ed. 322, 28 A.L.R. 1321] that a governmental regulation may constitute a taking if it " 'goes too far.' " (*MacDonald, Sommer & Frates* v. *Yolo County* (1986) 477 U.S. 340, 348 [106 S.Ct. 2561, 2566, 91 L.Ed.2d 285] (*MacDonald*); *Suitum* v. *Tahoe Regional Planning Agency* (1997) 520 U.S. 725 [117 S.Ct. 1659, 1665, 137 L.Ed.2d 980] (*Suitum*).) In *Lucas* v. *South Carolina Coastal Council* (1992) 505 U.S. 1003 [112 S.Ct. 2886, 120 L.Ed.2d 798] (*Lucas*) the high court observed that its earlier decisions "offered little insight into when, and under what circumstances, a given regulation would be seen as going 'too far' for purposes of the Fifth Amendment," observing that the approach to the issue has been an ad hoc, factual inquiry. (*Id.* at p. 1015 [112 S.Ct. at p. 2893].)

*Lucas* described "at least" two categories of regulatory action as compensable, only one of which is claimed here: "[W]here regulation denies all economically beneficial or productive use of the land." (*Lucas, supra,* 505 U.S. at p. 1015 [112 S.Ct. at p. 2893].) *Lucas* held that a taking occurs when, inter alia, the land use regulation " '*denies an owner economically viable use of his land.*' " (*Lucas, supra,* 505 U.S. at p. 1016 [112 S.Ct. at p. 2894], fn. omitted, quoting *Agins, supra,* 447 U.S. at p. 260 [100 S.Ct. at p. 2141], italics added by *Lucas*.)

■ To establish the regulatory taking, Milagra asserts it must first demonstrate that it has received a final decision regarding the application of

the challenged regulations to its property from the government entity charged with implementing the regulations, because the "court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." (*MacDonald, supra*, 477 U.S. at p. 348 [106 S.Ct. at p. 2566]; see also *Suitum, supra*, 520 U.S. at p. __ [117 S.Ct. at p. 1665]; see also *Williamson Planning Comm'n* v. *Hamilton Bank* (1985) 473 U.S. 172, 186 [105 S.Ct. 3108, 3116, 87 L.Ed.2d 126] (*Williamson*).) "[A]mong the factors of particular significance in the [taking] inquiry are the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations[,] . . . factors [that] simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." (*Williamson* at p. 191 [105 S.Ct. at p. 3119].) "Thus, a developer must at least 'resort to the procedure for obtaining variances . . . [and obtain] a conclusive determination by the [Planning] Commission whether it would allow' the proposed development . . . in order to ripen its taking claim." (*Suitum* 520 U.S. at p. __ [117 S.Ct. at p. 1666].)

The developer bears a heavy burden of showing that a regulation as applied to a particular parcel is ripe for a taking claim. It "must establish that it has submitted at least one meaningful application for a development project which has been thoroughly rejected, and that it has prosecuted at least one meaningful application for a zoning variance, or something similar, which has been finally denied. [Citations.]" (*Long Beach Equities, Inc.* v. *County of Ventura* (1991) 231 Cal.App.3d 1016, 1032 [282 Cal.Rptr. 877].) In *Williamson*, for example, a local planning commission refused to give final approval to a proposed development that did not comply in eight particulars with current zoning ordinances and subdivision regulations, including density requirements. The proposed development had been preliminarily approved several times when evaluated under the less restrictive requirements in effect when the development was first submitted to the commission, eight years earlier. *Williamson* held that the developer's taking challenge was premature because the developer had not sought variances from the current zoning ordinances and subdivision regulations that would allow development according to its final proposal. It also noted that variances could have been granted to resolve at least five of the commission's objections. (*Williamson, supra*, 473 U.S. at pp. 185, 188 [105 S.Ct. at pp. 3115-3117].)

Similarly, in *Del Oro*, the developer had recorded a final subdivision map for a residential development, and obtained financing and executed contracts for infrastructure development (roads, sewer, etc.) when the local electorate

adopted a residential growth initiative. The developer's letter request to the city attorney for an exemption from the scope of the initiative was denied. Its ensuing action, based on an "as applied" taking challenge to the initiative, was deemed premature because it had not sought approval of any specific ruling regarding development under the initiative. (31 Cal.App.4th at p. 1077.)[1]

■ Any determination of taking necessarily involves a comparison of the status of the property at the time it was acquired by the current owner, to its status at the time the owner received a final determination from the governmental entity denying its development application. In other words, how was it zoned then, and how is it zoned now? ■ Milagra has not provided a clear record of the permissible development of the property at the time it was acquired. However, assuming there has been a zoning change which affects development, Milagra concedes it has *not* submitted a development plan for the property as it is *currently* zoned.

Milagra contends that its application to the City to amend the general plan, and the electorate's rejection thereof, satisfied its obligation to obtain "a final, definitive position [from the City] regarding how it will apply the *regulations at issue* to the particular land in question." (*Williamson, supra,* 473 U.S. at p. 191 [105 S.Ct. at p. 3119], italics added.) It equates its request that the City amend its general plan with a request for a variance regarding the *actual regulations in place.*

■ All counties and cities in California are required to "adopt a comprehensive, long-term general plan for the physical development of the county or city . . . ." (Gov. Code, § 65300.) "The general plan is atop the hierarchy of local government law regulating land use. It has been aptly analogized to a 'constitution for all future developments.' [Citation]." *Neighborhood Action Group* v. *County of Calaveras* (1984) 156 Cal.App.3d 1176, 1183 [203 Cal.Rptr. 401].) A general plan amendment alters the course of the region's future development. By contrast, a variance is an administrative

---

[1]We are aware that we recently declined to follow *Del Oro* to the extent that dicta therein may suggest a property owner cannot mount an "as applied" constitutional challenge to a land use ordinance following exhaustion of administrative remedies unless the ordinance totally deprives the property owner of all possible economic value for no legitimate state interest. (*152 Valparaiso Associates* v. *City of Cotati* (1997) 56 Cal.App.4th 378, 385-386 [65 Cal.Rptr.2d 551].) Our *Valparaiso* opinion was not intended to disavow the basic principle that exhaustion of remedies is a prerequisite to an "as applied" taking claim.

or quasi-judicial act permitting minor deviations from existing land use regulations so that the landowner does not suffer undue hardship, but which does not violate the overall established land use regulatory scheme. (Gov. Code, § 65906; *Hamilton* v. *Board of Supervisors* (1969) 269 Cal.App.2d 64, 66 [75 Cal.Rptr. 106].) We interpret *Williamson* to mean that finality for purposes of a taking claim is determined by the denial of a requested deviation from the *present* land use scheme, not the rejection of an attempt to alter a comprehensive, long-range development scheme for the entire community. (*Williamson, supra,* 473 U.S. at pp. 187-190 [105 S.Ct. at pp. 3116-3118].)

 Since Milagra has not submitted an application to develop the property under the current zoning, we have no way of determining how the City will react to any development proposal. To state it as preexisting authorities have, we do not know whether Milagra has been "*denie[d]*" the "*economically viable use of* [*its*] *land.*" (*Lucas, supra,* 505 U.S. at p. 1016 [112 S.Ct. at p. 2894]; *Agins, supra,* 447 U.S. at p. 260 [100 S.Ct. at p. 2141].) Milagra does not have the unfettered right to develop its property in any manner it chooses, but must conform to reasonable regulations. (*HFH, Ltd.* v. *Superior Court* (1975) 15 Cal.3d 508, 515 [125 Cal.Rptr. 365, 542 P.2d 237].) As we previously noted, the record does not clearly indicate the zoning in place at the time Milagra initially acquired the property. What we do know is that the property has a substantially greater commercial area now than it did under Milagra's proposal to amend the general plan. Although it is not always the case, commercially zoned property in an established community frequently carries a higher value than residentially zoned property. Consequently, a combination of residential and commercial development which complies with existing zoning may well produce an economically viable use of the land. If strict compliance with the current zoning will not do so, a minor variance may be granted to produce that result. The current regulations obviously limit development of the property, but whether they prevent an economically viable use thereof or extinguish a fundamental attribute of ownership (*Agins* at p. 262 [100 S.Ct. at p. 2142]) is dependent on the City's final action on a proposal to develop the property as it .is currently zoned. Until then, Milagra's taking claim is not ripe for adjudication. (*Williamson, supra,* 473 U.S. at p. 186 [105 S.Ct. at p. 3116]; *MacDonald, supra,* 477 U.S. at p. 348 [106 S.Ct. at pp. 2565-2566].)

II

 Milagra further contends the undisputed facts establish that any further applications to develop the Property would be futile, thus permitting

a conclusion that the City has effectively made a final decision regarding the permitted use of the Property.

■ The futility exception to the ripeness doctrine relieves a developer from submitting "multiple applications when the manner in which the first application was rejected makes it clear that no project will be approved." (*Southern Pacific* v. *City of Los Angeles* (9th Cir. 1990) 922 F.2d 498, 504.) When the regulatory authority has "drawn the line, clearly and emphatically," as to the permissible use of the property, the developer is not required to submit additional development applications. (*Hoehne* v. *County of San Benito* (9th Cir. 1989) 870 F.2d 529, 533.) The exception is narrowly construed and the burden of establishing it lies with the developer. (*Ibid.*)

■ The futility exception is not applicable here. The City's general plan does not preclude all development of the Property. Milagra remains free to propose a development that conforms to the existing general plan or at least does not require as drastic a modification to present land use designations as an amendment to the general plan. By approving Milagra's project and a general plan amendment, the City demonstrated support generally for development of the Property. Even the voter argument against the general plan amendment implies that the opponents of the project are not against all development (Argument against measure A, Pacifica Special Mun. Elec., *supra*, ["This election is *not* about growth versus no-growth."]), so there is no certainty that the electorate would use the referendum process to reject all development proposals.

Finally, the declaration of Milagra's land use valuation expert does not establish futility. Milagra's expert, a real estate appraiser and consultant, opined there is no economically feasible use of the Property "*to date*" under current general plan and zoning designations. Futility may not be determined "by inquiring whether any beneficial use remains or whether the regulatory regime inhibits the property's marketability. Adoption of such standards would require courts to speculate as to what potential uses may be lurking in the hopes of the property owner and in the minds of developers and city planners. This would result in the same sort of speculation that the ripeness doctrine prohibits." (*Kinzli* v. *City of San Cruz* (9th Cir. 1987) 818 F.2d 1449, 1454.)

In light of our conclusion that Milagra's taking claim is not ripe for adjudication, we need not address its remaining arguments.

## DISPOSITION

The judgment is affirmed. Costs to respondents.

Peterson, P. J., and Jones, J., concurred.

Appellant's petition for review by the Supreme court was denied May 27, 1998.