[Nos. A097072, A097387, A097454. First Dist., Div. Five. July 1, 2003.]

SHEA HOMES LIMITED PARTNERSHIP et al., Plaintiffs and Appellants,
v.
COUNTY OF ALAMEDA et al., Defendants and Respondent;
SIERRA CLUB et al., Interveners and Respondents.

TRAFALGAR, INC., Plaintiff and Appellant, v.
COUNTY OF ALAMEDA, Defendant and Respondent.

COUNSEL

Crosby, Heafey, Roach & May, Kathy M. Banke, Jayne E. Fleming; Morrison & Foerster and Michael Zischke for Plaintiffs and Appellants Shea Homes Limited Partnership, Hong Yao Lin and Jennifer Lin.

Sheppard, Mullin, Richter & Hampton and David P. Lanferman for Plaintiff and Appellant Trafalgar, Inc.

Richard E. Winnie, County Counsel, Brian Washington, Assistant County Counsel, Lorenzo E. Chambliss, Deputy County Counsel; and M. Thomas Jacobson for Defendants and Respondents County of Alameda and Board of Supervisors of the County of Alameda.

Manuela Albuquerque, City Attorney (Berkeley) and Zach Cowan, Assistant City Attorney, for Cities of Berkeley, Oakland, Pleasanton, Livermore, Albany and Emeryville as Amici Curiae on behalf of Defendant and Respondent County of Alameda.

Trent W. Orr; Earthjustice and Deborah S. Reames for Interveners and Respondents, Sierra Club, Preserve Area Ridgelands Committee, Golden Gate Audubon Society and Greenbelt Alliance.

## OPINION

**JONES, P. J.**—Shea Homes Limited Partnership, Hong Yao Lin, Jennifer Lin (collectively Shea Homes) and Trafalgar, Inc. (Trafalgar) appeal judgments on the pleadings and denials of petitions for writ of mandate in their actions challenging the validity of Measure D, a "Citizens for Open Space Initiative Plan to Protect Agriculture and Open Space" adopted by the electorate of Alameda County (County) in November 2000.[1] They contend Measure D violates the single-subject rule. They also contend the trial court erred in granting judgment on the pleadings because their complaints sufficiently allege that Measure D violates various state housing laws. Trafalgar further contends that Measure D constitutes an arbitrary planning and zoning law, that it effects an unconstitutional regulatory taking on its face, and that respondents are estopped from enforcing it against Trafalgar.[2]

### BACKGROUND

*East County Area Plan*

In May 1994, the County adopted the East County Area Plan as a component of its general plan. "East County" encompasses 418 square miles of eastern Alameda County and includes the cities of Dublin, Livermore, Pleasanton, and a portion of Hayward, as well as surrounding unincorporated areas. Its planning area is bounded on the west by the Pleasanton/Dublin ridgeline, on the east by the San Joaquin County line, on the north by the Contra Costa County line, and on the south by the Santa Clara County line. The purpose of the East County Area Plan was to state clearly the County's intent concerning future development and resource conservation in the area to the year 2010. It established permissible land uses in the unincorporated areas. The East County Area Plan encompasses North Livermore, an unincorporated area of approximately 13,500 acres, located north of Interstate 580

---

[1] We ordered the separate appeals of Shea Homes and Trafalgar consolidated. We also permitted the cities of Berkeley, Oakland, Pleasanton, Livermore, Albany and Emeryville, collectively, to file an amicus brief.

[2] Shea Homes and County have asked us to take judicial notice of various documents that were not presented to the trial court. We deferred ruling on their requests until our decision on the merits of the case. We now decline the request.

and the City of Livermore's municipal boundary. Shea Homes owns approximately 2,700 acres of unimproved county property in North Livermore.

*Castro Valley and Palomares Canyonlands*

The Castro Valley and Palomares Canyonlands (Canyonlands) is an unincorporated area that lies, generally, west of the East County Area Plan and east of the cities of Oakland, San Leandro, and Hayward. It is encompassed in the Eden Planning Unit and the Castro Valley Plan components of the County's general plan; it is outside the Castro Valley Urban Boundary Area.[3] Trafalgar owns an equitable interest in approximately 77 unimproved (except for one private residence) acres within the Canyonlands.

*Measure D*

Measure D, an initiative approved by the County electorate on November 7, 2000, and effective December 22, 2000, amends portions of the East County Area Plan. It revises the urban growth boundary of eastern Alameda County to reserve less land for urban growth and more land for agriculture and open space.

Specifically, it relocates the urban growth boundary to coincide with existing or proposed city urban growth boundaries. Outside the urban growth boundary it removes land from previous urban development use designations, which included industrial, major commercial and land use categories having a density of one or more residential units per acre. It generally converts that land to 20-acre enhanced agricultural parcels upon demonstration of available water. In areas outside the relocated urban growth boundary that were not formerly designated for urban development, the existing rural zoning is maintained. New housing, including the County's affordable housing obligations, are inside the urban growth boundary unless otherwise required by state law. Land outside the relocated urban growth boundary that had been designated as urban land use is now redesignated as agricultural land.

Measure D removes the County from participation in the North Livermore planning process, including plans for the development of 12,500 housing units north of Interstate 580. This area is redesignated as agricultural land with the possibility for 20-acre enhanced agricultural parcels upon demonstration of available water. The East County Area Plan's "urban reserve" land use category is eliminated, and areas outside the urban reserve boundary are redesignated for agricultural use.

---

[3] There is no incorporated city of Castro Valley.

Measure D similarly amends the general plan's documents governing the Canyonlands. It maintains the Canyonlands' existing agricultural zoning and land uses. It prohibits development on ridgelines or hilltops unless no other site exists on a parcel.

Measure D provides that its provisions may be changed only by a vote of the electorate, although the Board of Supervisors may impose more stringent restrictions on development and land use. The board may also make technical or nonsubstantive modifications to Measure D's provisions for purposes of reorganization, clarification or formal consistency within the County's general plan.

*Procedural History*

Following the enactment of Measure D, Shea Homes filed a petition for writ of mandate and complaint for declaratory relief (Code Civ. Proc., §§ 1085, 1060; Alameda Co. action 835510-2). Pertinent to this appeal, it alleged that Measure D violated article II, section 8, subdivision (d) of the California Constitution, the "single subject rule," and state statutes governing housing requirements for a general plan. It prayed for a writ of mandate commanding the County to set aside its approval of Measure D as invalid and to refrain from implementing and applying it, and for a declaration that Measure D was invalid and unenforceable.

Trafalgar filed a separate petition for writ of mandate and complaint for declaratory relief. (Alameda Co. action no. 835646-0.) It alleged that since April 1998 it has been in the process of seeking the requisite land use approvals, including an amendment to the Castro Valley Plan, to redesignate its property from "agriculture" to "residential" so it could construct a development of 62 single-family houses thereon. As of the November 2000 election it had received initial approval from the County's planning staff for its project.

Like Shea Homes, Trafalgar alleged violations of the single subject rule and various state housing laws. Additionally, it alleged that Measure D was inconsistent with the County's general plan, and it made a facial challenge to Measure D as an unconstitutional regulatory taking without just compensation. It sought the same relief as Shea Homes, plus a declaration that Measure D was inapplicable to its property.

The Sierra Club, Preserve Area Ridgelands Committee, Golden Gate Audubon Society, and Greenbelt Alliance (collectively, Interveners) sought to intervene as defendants in the two actions.

Pursuant to the stipulation of appellants and the County, the court ordered the two actions consolidated for purposes of briefing and hearing but not for judgment and appeal, and allowed the intervention, on condition Interveners acted as a single party.

The County and Interveners moved for judgment on the pleadings as to all causes of action in appellants' petitions for writ/complaints for declaratory relief. At the hearing on the motion, the parties stipulated that the court's ruling on the petitions for writ of mandate would be dispositive on the motions for judgment on the pleadings, except for appellants' causes of action for violation of the state housing statutes and Trafalgar's unlawful taking cause of action.

The court denied the petitions for writ of mandate. It granted judgment on the pleadings without leave to amend as to the causes of action for violation of the housing statutes and unlawful taking because the pleadings, moving papers and matters judicially noticed demonstrated that appellants could not amend their pleadings to state a viable or ripe claim that Measure D violated state housing laws or that Measure D effected a facial regulatory taking without just compensation. It granted judgment on the pleadings without leave to amend as to the remaining causes of action pursuant to the parties' stipulation that denial of the petitions for writ of mandate would dispose of them.

## DISCUSSION

*Standard of Review*

■ Judgment on the pleadings is akin to a demurrer and is properly granted only if the complaint does not state facts sufficient to state a cause of action against that defendant. (Code Civ. Proc., § 438, subd. (c)(1)(B)(ii); *Smiley v. Citibank* (1995) 11 Cal.4th 138, 146 [44 Cal.Rptr.2d 441, 900 P.2d 690].) The grounds for the motion must appear on the face of the complaint, and in any matters subject to judicial notice. (Code Civ. Proc., § 438, subd. (d).) The court accepts as true all material factual allegations, giving them a liberal construction, but it does not consider conclusions of fact or law, opinions, speculation, or allegations contrary to law or judicially noticed facts. (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 515–516 [101 Cal.Rptr.2d 470, 12 P.3d 720] (*Gerawan*); *Long Beach Equities, Inc. v. County of Ventura* (1991) 231 Cal.App.3d 1016, 1024 [282 Cal.Rptr. 877].) Appellate courts review the record de novo to determine whether the complaint states a cause of action as a matter of law. (*Gerawan*, at p. 516; *Home Builders Assn. v. City of Napa* (2001) 90 Cal.App.4th 188, 193 [108 Cal.Rptr.2d 60].) Pursuant to these principles, we consider whether appellants' pleadings state a claim that Measure D is constitutionally invalid.

## I. *Single Subject Rule*

Article II, section 8. subdivision (d), of the California Constitution states: "An initiative measure embracing more than one subject may not be submitted to the electors or have any effect." This rule applies to local as well as statewide initiatives. (*Pala Band of Mission Indians v. Board of Supervisors* (1997) 54 Cal.App.4th 565, 581–582 [63 Cal.Rptr.2d 148].)

■ An initiative measure does not violate the single subject rule if, despite its varied collateral effects, all its parts are reasonably germane to each other and to the initiative's general purpose or objective. (*Senate of the State of Cal. v. Jones* (1999) 21 Cal.4th 1142, 1157 [90 Cal.Rptr.2d 810, 988 P.2d 1089] (*Jones*).) The rule does not require each provision of a measure, in effect, to interlock in a functional relationship. (*Ibid.*) The various provisions must simply have a reasonable relationship to a common theme or purpose. Courts uphold initiative measures if they fairly disclose a reasonable and commonsense relationship among their several components in furtherance of a common purpose. (*Ibid.*) Courts are also obligated to resolve any reasonable doubts in favor of the exercise of the right of the initiative. (*Brosnahan v. Brown* (1982) 32 Cal.3d 236, 241 [186 Cal.Rptr. 30, 651 P.2d 274].)

Shea Homes characterizes Measure D's separate subjects as (1) the constriction of the County's urban growth boundary and alteration of land use designations outside that boundary so as to eliminate the County's ability to approve new housing, and (2) the alteration of the County's solid waste management and planning practices. It contends the latter subject is contained in Measure D's amendments to Policies 141 and 230 of East Area County Plan.[4]

---

[4] Trafalgar's appellate briefing does not address the application of the single subject rule to Measure D. It simply states that, "[a]s a matter of law, Measure D illegally violated the 'single subject' rule for initiatives," and that it joins in and incorporates the Shea Homes briefing in the consolidated cases.

As amended by Measure D, Policy 141 states: "The County shall provide for minimum state requirements for landfill capacity. Permits for new landfills or landfill expansions shall be limited to 15 years' capacity, except to the extent a longer period is necessary to meet State standards. 'Capacity' for expansions shall be determined by disposal of waste from within Alameda County and San Francisco City and County in the landfill during the year prior to filing the permit application multiplied by the permit period or by the average annual disposal of waste from within Alameda County and San Francisco in the landfill over the 5 year period preceding the application multiplied by the permit period, in either case to be adjusted proportionately by the Recycling Board's estimated percentage increase or decrease of solid waste generation in the County during the permit period. 'Capacity' for new landfills shall be determined from then existing or reasonably projected contracts to use the new facility for waste generated within Alameda County and San Francisco during the permit period, again adjusted by the Recycling Board's estimated changes in solid waste generation. The County shall approve no new facility or expansion which would impede achievement of landfill

We disagree that Measure D's restrictions on new housing developments in the eastern and Canyonlands areas of the County and its directives regarding landfills and solid waste management policies and programs constitute distinct subjects. ■ Whether an initiative satisfies the standard for compliance with the single subject rule may be determined by the extent to which its provisions are germane to the general subject as reflected in the title and the field of legislation suggested thereby. (*Chemical Specialties Manufacturers Assn., Inc. v. Deukmejian* (1991) 227 Cal.App.3d 663, 667 [278 Cal.Rptr. 128].) Measure D is entitled "Save Agriculture and Open Space Lands." Its overarching purpose is "to preserve and enhance agriculture and agricultural lands, and to protect the natural qualities, the wildlife habitats, the watersheds and the beautiful open spaces of Alameda County from excessive, badly located and harmful development."

Measure D contains numerous findings pertinent to its stated purpose. The findings describe the inadequacy of current general plan safeguards to protect the open space of the East County and the Canyonlands, and the potential degradation to the open space and agricultural lands therein from sprawling development. They note the uneconomical scattered and far-flung public facilities that would result therefrom and the increased air pollution, traffic, and demand for water attendant thereto. The findings specifically state that compact housing developments will not have the adverse effect on the environment that "sprawl" does and that landfills are "massive, ugly and environmentally harmful uses of land. Recycling will greatly reduce the amount of land needed for waste disposal."

Given these findings, the provisions of Measure D that limit landfills and require the County's Board of Supervisors to conform and coordinate East County Area Plan solid waste policies with those of other County agencies (the Recycling Board and the Waste Management Authority) are eminently germane to Measure D's purpose of enhancing and protecting the open space and agricultural lands of East County and the Canyonlands. Placing a limitation on landfills, as provided in the amendment to Policy 141, clearly allows for greater open and/or agricultural space. Requiring conformance and coordination of the County's solid waste policies with those of other public agencies handling recycling and waste management, as provided in the amendment to Policy 230, will promote and/or require recycling, which in

---

diversion goals according to the Recycling Board schedule. Nothing in [Policy 141 or Measure D] shall alter or affect the terms of the Altamont Landfill Expansion Settlement Agreement of December 5, 1999."

As amended by Measure D, Policy 230 states: "The County shall conform its solid waste policies and programs to the Recycling Plan prepared by the Recycling Board, and generally coordinate its hazardous and solid waste management with the Alameda County Waste Management Authority's goals, policies, and plans, except to the extent that they are inconsistent with [Measure D] or the Recycling Plan."

turn will reduce the need for landfill. These amended policies, along with the provisions in Measure D that effectively restrict new housing, are complementary mechanisms to achieve Measure D's purposes of preserving and enhancing agricultural land and protecting open space, wildlife habitats, and watershed from excessive and badly located development.

Shea Homes reasons that the solid waste management provisions included in Measure D result in a violation of the single subject rule because (1) Measure D's title, its introductory section entitled "Purposes," the ballot description, and the arguments in the voter pamphlet did not mention its solid waste provisions, thereby misleading the voting public as to the breadth of the initiative; (2) solid waste management is a "complex and independent subject" unto itself, as reflected in the extensive and detailed state statutory and local regulatory schemes that govern it, e.g., the Integrated Waste Management Act (Pub. Resources Code, § 40000 et seq.) and section 64 of the County's charter providing for a County recycling plan (see *City of Dublin v. County of Alameda* (1993) 14 Cal.App.4th 264, 272 [17 Cal.Rptr.2d 845]; and (3) the solid waste provisions in Measure D realign local governmental authority over solid waste management, "a matter wholly unrelated to *any* kind of land use." (Italics in original.)

Appellants' argument is unavailing. First, the literature provided to the voters alerted them that Measure D contained provisions pertaining to solid waste management. The official ballot pamphlet contained the entire text of Measure D. The opening paragraph of the text refers to the measure as protecting against excessive, badly located and harmful development in County open spaces and agricultural lands. Page 2 of that text contains the finding that landfills are environmentally harmful uses of land, and recycling will reduce their necessity. Thus, even if a voter did not read beyond page two of the text, he or she could reasonably expect that Measure D would contain more detailed provisions concerning landfill and recycling matters, i.e., matters directly concerned with solid waste management.

Second, the fact that there are state statutes and County regulations specific to waste management does not preclude an initiative that amends a general plan from including provisions that also deal with solid waste management. A state statutory scheme does not restrict or preempt the power of an initiative simply because the initiative includes some elements of statewide concern. (*San Mateo County Coastal Landowners' Assn. v. County of San Mateo* (1995) 38 Cal.App.4th 523, 537–538 [45 Cal.Rptr.2d 117] (*San Mateo County Coastal*).) In fact, general plans are required to contain a land use element that designates the land to be used for, inter alia, "solid and liquid waste disposal facilities." (Gov. Code, § 65302, subd. (a).) Because the amendments to policies 141 and 230—landfill restriction and coordination of

recycling—are germane to the objective of Measure D—protection and enhancement of East County and Canyonlands open space and agricultural land—they do not create a violation of the single subject rule by being the topic of laws other than Measure D.

Third, Measure D's provision that the County conform its solid waste policies to those of the Recycling Board's recycling plan and coordinate its solid waste management with the goals and policies of the Waste Management Authority (amended Policy 230) cannot reasonably be construed as a "realignment" of the authority of the County Board of Supervisors and the Recycling Board over solid waste management.[5] It is simply a directive that in establishing solid waste policies for the East County Area Plan, the Board is to be guided by the policies of these other county agencies, except to the extent the policies of the Waste Management Authority are inconsistent with Measure D or the recycling plan. The amendment to Policy 230 does not cede the Board's authority to either of these other agencies. The Board remains the entity that applies these agencies' policies to landfill and recycling decisions so as to further Measure D's finding that recycling will reduce the amount of land needed for waste disposal, i.e., landfill that is a harmful use of land and contrary to the goal of preserving land for open space and agricultural usage.

Even accepting as true appellants' premise that Measure D shifts the relative authority of the Board of Supervisors, Waste Management Authority, and Recycling Board over solid waste management, the shift does not result in a violation of the single-subject rule. The purpose of the single-subject rule is to avoid voter confusion and subversion of the electorate's will. (*Jones, supra*, 21 Cal.4th at p. 1156.) An initiative that is entitled "Save Agriculture and Open Space Lands" reasonably and naturally encompasses provisions that will (1) limit a use of the land at issue, such as a landfill, that is incompatible with this title, and (2) promote an activity, such as coordination of solid waste recycling and management, that fosters this title by reducing a cause for encroachment on open space. Consequently, such provisions, even

---

[5] In 1990, the electorate approved a County initiative, the stated purpose of which was to provide for a Recycling Plan that would meet the refuse reduction goals mandated by the 1989 Integrated Waste Management Act. (Pub. Resources Code, § 40000 et seq.) (*City of Dublin, supra*, 14 Cal.App.4th at pp. 270, 272.) The Recycling Plan was to include several essential programs to minimize the generation of refuse, establish residential and commercial recycling programs, and establish recycled product market development and purchase preference programs. (*Ibid.*) The Recycling Plan was to be administered and coordinated by an 11-member appointed board. (*Id.* at p. 272.)

The Waste Management Authority was established in 1990 by a joint powers agreement for waste management entered into by the County, its cities, and two sanitary districts. It was delegated the power to prepare, adopt, revise, amend, administer and enforce the County's Integrated Waste Management Plan, which was created pursuant to the mandate of the Integrated Waste Management Act. (*City of Dublin, supra*, 14 Cal.App.4th at pp. 273, fn. 6, 285.)

if they may effectively realign agency responsibility for solid waste management, would not mislead a voter as to Measure D's purpose, because, like all the provisions in the measure, they are germane to achieving its clearly stated objective of preserving and enhancing specifically defined open space and agricultural lands within the County. We find no violation of the single subject rule in Measure D.

## II. *Violation of State Housing Laws*

■ A local government may not adopt ordinances that conflict with the State Planning and Zoning Law. (Gov. Code, § 65000 et seq.[6]; *Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 547 [277 Cal.Rptr. 1, 802 P.2d 317].) Appellants contend the court erred in granting judgment on the pleadings because their complaints allege that Measure D conflicts with the Planning and Zoning Law housing requirements contained in sections 65913.1, 65008, subdivision (c), 65584.5, and 65915. Therefore, they argue, they are entitled to have their housing law claims heard on the merits and an opportunity to present evidence of Measure D's impact on the County's ability to comply with the state statutes.

■ A county "may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.) A conflict exists if the local legislation contradicts general law, i.e., is inimical thereto. (*Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 897–898 [16 Cal.Rptr.2d 215, 844 P.2d 534].) Claims that a local ordinance conflict with a state statutory scheme implicate questions of law, not fact. (See *Trader Sports, Inc. v. City of San Leandro* (2001) 93 Cal.App.4th 37, 45 [112 Cal.Rptr.2d 677]; *Northern Cal. Psychiatric Society v. City of Berkeley* (1986) 178 Cal.App.3d 90, 100 [223 Cal.Rptr. 609].) The first step in the reviewing court's inquiry is to determine whether a genuine conflict exists between the local ordinance and the state law. (*Traders Sports,* at p. 46; see also *Johnson v. Bradley* (1992) 4 Cal.4th 389, 400 [14 Cal.Rptr.2d 470, 841 P.2d 990].) We therefore examine Measure D in relation to the four enumerated statutes to determine if they actually conflict.

### a. *Section 65913.1*

In November 2000, section 65913.1 provided that in exercising its authority to zone for land uses, a county was required to "designate and zone sufficient vacant land for residential use with appropriate standards, in relation to zoning for nonresidential use, and in relation to growth projections

---

[6] All further section references are to the Government Code.

of the general plan to meet housing needs as identified in the general plan."[7] This statute is part of the "least cost zoning law" (*Hernandez v. City of Encinitas* (1994) 28 Cal.App.4th 1048, 1072 [33 Cal.Rptr.2d 875]), the purpose of which is to encourage local governments to approve needed and sound housing developments that will alleviate the "severe shortage" of affordable housing for low and moderate income families. (§ 65913.)[8]

In their pleadings to the trial court appellants alleged[9] that Measure D violates section 65913.1 because (1) it eliminates the East County Area Plan land use designations that support residential development on vacant land in the unincorporated areas of the County outside the urban growth boundary; (2) it stops the joint planning process in North Livermore that sought to zone vacant land for a mix of very-low-low-, and moderate-income housing units in accordance with the East County Area Plan; and (3) it does not provide any substitute locations, vacant or not, for the development of such housing. Therefore, appellants alleged, Measure D forces the County out of compliance with section 65913.1 and the housing element of its general plan, which, they allege, specifically identifies North Livermore as an appropriate location to satisfy the County's housing needs. Appellants further alleged that to allow the County to avoid its share of regional housing needs by implementing Measure D would be contrary to the intent of section 65913.1.

Measure D eliminates policy 23 from the East County Area Plan, which would have allowed for major new urban developments in the unincorporated North Livermore area. These developments would have included, inter alia, residential use. However, the housing element of the County's general plan,

---

[7] Effective January 1, 2002, this section was amended to state: "In exercising its authority to zone for land uses and in revising its housing element pursuant to [section 65580 et seq.] a city, county, or city and county shall designate and zone sufficient vacant land for residential use with appropriate standards, in relation to zoning for nonresidential use, and in relation to growth projections of the general plan to meet housing needs for all income categories as identified in the housing element of the general plan."

[8] Section 65913 is a statement of legislative findings and declarations that pertains to the "severe shortage of affordable housing, especially for persons and families of low and moderate income," and to the need to encourage new housing by various specified means, including changes in law designed to assure that local governments "zone sufficient land at densities high enough for production of affordable housing," and "make a diligent effort through the administration of land use and development controls and the provision of regulatory concessions and incentives to significantly reduce housing development costs and thereby facilitate the development of affordable housing .... "

[9] As with the other three statutes with which they allege Measure D conflicts, appellants on appeal have simply asserted the existence of a conflict between section 65913.1 and Measure D, and in conclusory fashion argue they should be allowed to present evidence of a conflict. They have presented no analysis in their briefing as to why or how, as a matter of law, there is a genuine conflict between the statutes and Measure D. Nevertheless, we address the purported conflicts as alleged in appellants' pleadings.

in effect when Measure D was adopted, specifically excluded the "development potential" of the unincorporated area of East County,[10] which includes North Livermore, from its inventory of land suitable for residential development. Although Measure D will reduce the amount of vacant land in unincorporated North Livermore that is available for residential use, the housing element did not identify this area as land to be used to meet the County's housing needs. Consequently, Measure D does not conflict with section 65913.1's requirement that a county must zone sufficient vacant land for residential use "in relation to growth projections of the general plan to meet housing needs as identified in the general plan."

b. *Section 65008, subdivision (c)*

Under section 65008, subdivision (c), a county, when enacting any planning or zoning ordinance, may not prohibit or discriminate against a residential development because it is intended for occupancy by low and moderate income families. Appellants alleged Measure D violates this statute because (1) it eliminates the possibility of residential development outside the urban growth area in any density sufficient to accommodate affordable housing; (2) it eliminates the amount of vacant land available within the unincorporated regions of the County for the development of such housing; and (3) it discriminates against very-low-low-, and moderate-income housing units because it replaces the units formerly allowed in the East County Area Plan with "20–acre estates for wealthy individuals."

Appellants' allegations do not demonstrate a conflict with section 65008, subdivision (c), in the face of the language of Measure D. None of Measure D's provisions discriminate or may be implied to have a discriminatory effect against low-income persons. To accomplish its purpose of preserving open space and agricultural land, Measure D establishes an urban growth boundary that will encourage compact development, which "provides more affordable housing than sprawl," and will in turn allow for a more economical infrastructure. It does not ban or limit low-income housing while permitting expensive single-family houses on large lots. (See *Associated Home Builders, Etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 602 [35 Cal.Rptr. 41, 557 P.2d 473].) In fact, it amends the East County Area Plan to require affordable units to be reasonably dispersed throughout residential projects, to require residential developments of 20 or more units to include affordable housing units, and to require the County to adopt an ordinance to establish a very-low-income housing fee applicable to all new unincorporated area market-rate housing that does not directly provide its fair share of housing.

---

[10] The housing element identifies this area as Livermore-Amador Valley.

Furthermore, if Measure D were held to conflict with section 65008, subdivision (c), because it precludes, outside the urban growth zone, housing developments that are sufficiently dense to be affordable, the County could never reserve land for open space or agriculture. Unless they provided for housing densities sufficient for affordable housing, all regulations governing all County land uses could be construed as violating section 65008, subdivision (c). ■ The various parts of a statutory enactment must be harmonized by considering a particular section in the context of the statutory framework as a whole. (*Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 231 [110 Cal.Rptr. 144, 514 P.2d 1224].) In the context of the Planning and Zoning Law (§ 65000), of which it is a part, section 65008, subdivision (c), cannot be read so narrowly. Doing so would be contrary to the fundamental purpose of that whole statutory scheme: "[T]o protect California's land resource, to insure its preservation and use in ways which are economically and socially desirable in an attempt to improve the quality of life in California." (§ 65030.)

### c. *Section 65584.5*

Section 65584.5 provides, generally, that a city or county may transfer a percentage of its share of the regional housing needs to another city or county if certain conditions are met. Appellants alleged that Measure D fails to demonstrate that any cities within the County have agreed to accept an increase in their share of affordable housing; fails to indicate where the housing units displaced from the "lands north of I–580" (i.e., unincorporated North Livermore) will be built; and whether, if built in other cities, the transfer of housing units will result in more affordable units than without the transfer.

There is no language in Measure D that directly transfers the County's share of regional housing to one or more of the cities in the County. Nor is there any language that can be construed as implying the County is attempting to abdicate its responsibility for its share of regional housing. Measure D's redesignation of the urban growth zone in the East County Area Plan and its proscription against statutorily required housing on ridgelines, steep slopes, or critical wildlife habitat may require the County to rezone some unincorporated land to increase density to meet its affordable housing. That possibility, however, does not constitute a failure to provide an alternative for the displaced housing or a defective transfer of its share of housing needs.

### d. *Section 65915*

Section 65915, subdivision (b), provides that when a housing developer agrees to construct a certain percentage of total units of a housing development for low-income households, a county shall grant a density bonus and at

least one of several itemized concessions or incentives or provide other incentives of equivalent value based on the land cost per dwelling unit. "Density bonus" is defined as a density increase of at least 25 percent, unless the developer elects a lesser percentage, over the otherwise maximum allowable residential density under the applicable zoning ordinance and land use element of the general plan, and it applies to housing developments of five or more dwelling units. (§ 65915, subd. (f).)

Appellants alleged that Measure D prevents the County from complying with this statute because the "purported" density bonus allowed by Measure D for property in the North Livermore Intensive Agricultural Area is illusory, given the "numerous constraints" Measure D imposes on the ability to subdivide this area. Consequently, they allege, Measure D substantially limits the amount of land and number of development projects that would be able to qualify for a density bonus under section 65915.

Section 65915 is one of several state statutes reflecting "an important state policy to promote the construction of low income housing and to remove impediments to the same." (*Building Industry Assn. v. City of Oceanside* (1994) 27 Cal.App.4th 744, 770 [33 Cal.Rptr.2d 137] (*Oceanside*).) It does so by rewarding a developer who agrees to build a certain percentage of low-income housing with the opportunity to build more residences than would otherwise be permitted by the applicable local regulations.

Measure D's density limit in the North Livermore Intensive Agricultural Area does not impede this policy, any more than does the density limit in any other area within Measure D's scope. Counties will necessarily vary the permissible density depending on the land use designation of a particular area. Policy 43 of Measure D, for example, by requiring that "residential developments of 20 or more units" must maintain specified percentages of affordable housing, contemplates that other sections in the East County Area Plan will have a greater housing density than that of the North Livermore Intensive Agriculture Area, and those other areas, by containing more housing generally, will implicitly be able to provide more low-cost housing. In short, Measure D's low density limitation of one specific region within East County does not preclude accommodation of the state policy of promoting low-income housing construction in other regions of East County. Therefore, Measure D does not conflict with section 65915.

Relying on documents of which the trial court took judicial notice and on *San Mateo County Coastal, supra,* 38 Cal.App.4th 523 and *Building Industry Assn. v. Superior Court* (1989) 211 Cal.App.3d 277 [259 Cal.Rptr. 325]

(*Building Industry*[11]), appellants argue they have pled sufficient violations of these four housing laws to permit trial on the merits of their housing law claims. Neither the judicially noticed material nor the cases assist them.

The documents are pre- and postelection reports or letters by County departments and agencies observing that Measure D, by restricting residential development in North Livermore, could affect the County's ability to meet its state housing obligations. Although these comments may show that the County will face greater difficulty in complying with the housing statutes than it would have if the North Livermore area had not been redesignated for agriculture and open space, they are only opinions. They do not show that as a result of Measure D, it is now impossible for the County to comply.

In *San Mateo County Coastal*, plaintiffs brought an action challenging the validity of an initiative that amended the county's local coastal program. (*San Mateo County Coastal, supra,* 38 Cal.App.4th at pp. 532–533.) Defendant county moved for summary adjudication and defendant interveners moved for judgment on the pleadings. The trial court granted in part the motion for summary adjudication. The motion for judgment on the pleadings was impliedly denied, insofar as "[t]he remaining causes of action were tried to the court," which entered judgment in favor of all defendants. (*Ibid.*) Given the procedural posture of the case when it reached the appellate court, the *San Mateo County Coastal* court had no reason to, and did not, discuss or rule on the propriety of the motion for judgment on the pleadings.

In *Building Industry*, the plaintiffs challenged a City of Oceanside zoning ordinance initiative as, inter alia, conflicting with several of the same housing statutes with which, according to appellants, Measure D conflicts. (*Building Industry, supra,* 211 Cal.App.3d at p. 280.) The zoning initiative was a numerical growth control ordinance. (*Id.* at p. 294.) With certain exceptions, it adopted a maximum number of dwelling units that could be constructed each year for the ensuing 12 years. (*Id.* at p. 285.) It also eliminated from consideration for a building permit projects that did not meet a reviewing board's criteria for site and architectural quality from consideration for a building permit. (*Id.* at p. 286; *Oceanside, supra,* 27 Cal.App.4th at p. 750.) The trial court denied the plaintiffs' motion for summary judgment on the grounds that triable issues of material fact had to be determined in order to resolve whether there was a facial inconsistency between the zoning initiative and the state housing laws. (*Id.* at p. 284.) The plaintiffs sought a writ of mandate from the appellate court on the ground the case presented only a question of law involving a facial inconsistency. (*Ibid.*)

---

[11] Although appellants' brief cites *Oceanside, supra,* 27 Cal.App.4th 744, their reliance is more accurately on *Building Industry,* a earlier opinion in the same case.

The appellate court denied the writ. (*Building Industry, supra*, 211 Cal.App.4th at p. 298.) It held that the invalidity of the zoning initiative could be established only by determining facts bearing on whether it "truly" conflicted with state laws and their purposes. (*Id.* at p. 290.) For example, whether the city's share of regional housing needs, as established by the regional association of governments, "are and will be met" under the zoning initiative was a question of material fact awaiting proof. (*Id.* at pp. 282, 293.)

The zoning initiative at issue in *Building Industry*, however, differed in significant respects from Measure D. Unlike Measure D, the *Building Industry* initiative placed a specific annual numerical limit on the number of dwelling units that could be constructed (*Building Industry, supra*, 211 Cal.App.3d at p. 285), and there is a rebuttable presumption that such a limiting ordinance has an impact on the residential units available in the area. (Evid. Code, § 669.5.) The *Building Industry* initiative also required proposed dwelling units to pass aesthetic muster (*Building Industry*, at p. 286; *Oceanside, supra*, 27 Cal.App.4th at p. 750), and it was applicable to the entire city of Oceanside (*Building Industry*, at p. 285). Such provisions of the initiative had the potential for a negative effect on the number of low-income dwellings that would be built, and, by extension, on the city's ability to comply with state standards to promote low-income housing. Under the circumstances, resolution of the issue of the initiative's conflict with state housing statutes necessitated factual determinations, including projections of the reasonable probability of the city's accommodating its regional housing requirements over the next decade. (*Building Industry*, at p. 294.)

Measure D, by contrast, does not place a cap on the number of dwelling units that can be constructed in a given year; it does not require the denial of building permits to projects that fail to satisfy aesthetic criteria; and it affects a limited area of the County. Furthermore, section 7 of the measure specifically states that none of its provisions shall be applied so as to preclude the County's compliance with state law housing obligations. Although section 7 requires the County to meet its state–imposed housing obligations in the East County Area, as far as possible, within the East County Area Plan urban growth boundary, section 7 provides two mechanisms to ensure compliance with those housing obligations if the existing boundary prevents it.

First, section 7 authorizes the voters to approve an extension of the East County Area Plan urban growth boundary. We should not presume that the County electorate will fail to approve a proper corrective extension if the present boundary proves inadequate to meet mandated housing needs. (See *DeVita v. County of Napa* (1995) 9 Cal.4th 763, 792–793 [38 Cal.Rptr.2d 699, 889 P.2d 1019].) Section 7 also authorizes the County Board of Supervisors to approve housing beyond that boundary to meet state housing

requirements if certain factors are demonstrated and certain guidelines as to location of that housing are adhered to.

■ All enactments, including initiatives, are to be construed, whenever possible, in a manner that preserves their validity. (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281].) The express language of Measure D permits a construction that precludes it from violating the housing statutes; consequently there are no factual issues requiring resolution by trial on the merits. Because there is no actual conflict between Measure D and the enumerated state housing laws, respondents are entitled to judgment on appellants' causes of action for violation thereof.

In short, appellants have urged on appeal that their bare allegations of housing statute violations were sufficient in and of themselves to overcome the motions for judgment on the pleadings. Such an argument would defeat any demurrer or nonstatutory motion for judgment on the pleadings where a pleading on its face recites a statutory violation. In so arguing, appellants refuse to acknowledge the analytical impact of clauses such as section 7 which, together with the rule that initiatives are to be upheld when possible, may defeat a challenged cause of action as a matter of law.

### III. *Trafalgar's Taking Claims*

Trafalgar alleged that Measure D, on its face, constituted an unlawful taking of its Canyonlands property because Measure D restricts the land use and the planning and zoning designations applicable to its property and imposes an "ill-defined 'open space preserve' designation on [Trafalgar's] property, under which essentially no activities would be permitted on [Trafalgar's] property other than some forms of agriculture." It further alleged that, given the physical characteristics of its property, the only permitted and physically feasible agricultural activity would be seasonal agricultural grazing, which is not an economically viable use of the property.

■ To determine whether an unconstitutional taking has occurred, California courts are guided by the decisions of the United States Supreme Court. (*Milagra Ridge Partners, Ltd. v. City of Pacifica* (1998) 62 Cal.App.4th 108, 116 [72 Cal.Rptr.2d 394] (*Milagra Ridge*).)

■ A facial challenge questions only "whether the mere enactment of" the land use regulation constitutes a taking. (*Agins v. Tiburon* (1980) 447 U.S. 255, 260 [65 L.Ed.2d 106, 100 S.Ct. 2138] (*Agins*).) The test to be applied in considering a facial challenge is straightforward. An ordinance regulating the use of property effects a taking if it does not "substantially advance legitimate

state interests," or it denies the owner economically viable use of his land. (*Ibid.*; *Keystone Bituminous Coal Assn. v. DeBenedictis* (1987) 480 U.S. 470, 495 [94 L.Ed.2d 472, 107 S.Ct. 1232].) Claimants "face an uphill battle in making a facial attack [on a land use regulation] as a taking." (*Keystone, supra,* at p. 495.)

Trafalgar cannot claim Measure D fails to advance a legitimate interest. As *Agins* observes, California has determined that the development of local open-space plans will discourage the premature and unnecessary conversion of open space to urban uses and the attendant ill effect of urban sprawl, such as air, noise and water pollution, traffic congestion, destruction of scenic beauty, etc. (*Agins, supra,* 447 U.S. at p. 261.) Such a governmental purpose has long been recognized as legitimate. (*Ibid.*) Measure D specifically articulates that it is intended to protect against such adverse consequences, as well as the blighting of existing city centers.

Nor can Trafalgar claim that it has suffered a taking because Measure D calls upon it "to sacrifice *all* economically beneficial" or productive use of its property "in the name of the common good, that is, to leave [its] property economically idle." (See *Lucas v. South Carolina Coastal Council* (1992) 505 U.S. 1003, 1019 [120 L.Ed.2d 798, 112 S.Ct. 2886], italics in original.) ▮ Generally, if permissible uses exist, a development restriction does not deny a property holder the economically viable use of his property. (See *Agins, supra,* 447 U.S. at p. 262; *Hodel v. Virginia Surface Mining & Recl. Assn.* (1981) 452 U.S. 264, 296 [69 L.Ed.2d 1, 101 S.Ct. 2352].)

Before the enactment of Measure D, Trafalgar's property was designated as "agriculture," a designation unchanged by Measure D. Measure D allows a single-family house per parcel in the Canyonlands, if certain County standards, such as adequate road access and water facilities, are met. It also allows recreational use; public and quasi-public use; secondary residential units; quarries; agriculture structures; and "similar and compatible uses." Additionally, Measure D specifies that, notwithstanding their literal terms, its provisions "do not apply to the extent, but only to the extent, that courts determine that if they were applied they would deprive any person of constitutional or statutory rights or privileges, or otherwise would be inconsistent with the United States or State constitutions or law. The purpose of this provision is to make certain that this ordinance does not violate any person's constitutional or legal rights."

Given this array of permissible uses that remain open to Trafalgar's Canyonlands property, and the flexibility afforded the County to avoid any potentially unconstitutional application of designated parcel size in the Canyonlands area (see *San Mateo County Coastal, supra,* 38 Cal.App.4th at p. 547), Trafalgar cannot demonstrate Measure D is invalid on its face.

Although Trafalgar's complaint makes only a facial challenge to Measure D, it now asserts that it explained to the trial court at the hearing on respondents' motion for judgment on the pleadings that it also intended to include an "as-applied" challenge.

At the hearing Trafalgar informed the court that before Measure D was adopted, it was near completion of the planning process for a residential project, and since the adoption of Measure D, the County had conducted two hearings regarding the development, "the upshot" of which was that the County had no authority, despite a final environmental impact report for the project, to approve the project unless it "[went] to the voters." Trafalgar further stated that it believed it had exhausted its only available remedy and was thus at a "dead end," but if it was incorrect, "we would presumably need" leave to amend, which "we would be happy" to do.

The court denied leave to amend because the matters judicially noticed demonstrated that Trafalgar could not amend its pleadings to state a viable or "ripe" claim that Measure D effected a regulatory taking without just compensation.

The trial court did not abuse its discretion in denying leave to amend. Trafalgar did not demonstrate a reasonable possibility that it could cure any defects in its complaint concerning an as–applied challenge to Measure D. (See *Traders Sports, Inc. v. City of San Leandro, supra,* 93 Cal.App.4th at p. 45.)

■ A takings claim challenging the application of a land use regulation is not ripe unless the government entity charged with implementing the regulation has reached a final decision regarding the application of the regulation to the property at issue. (*Palazzolo v. Rhode Island* (2001) 533 U.S. 606, 618 [150 L.Ed.2d 592, 121 S.Ct. 2448].) "The developer bears a heavy burden of showing that a regulation as applied to a particular parcel is ripe for a taking claim. It 'must establish that it has submitted at least one meaningful application for a development project which has been thoroughly rejected, and that it has prosecuted at least one meaningful application for a zoning variance, or something similar, which has been finally denied.' [Citations.]" (*Milagra Ridge, supra,* 62 Cal.App.4th at p. 117.)

■ A final determination by the responsible agency enables the court to make the constitutional determination as to whether the regulation has deprived a landowner of all economically beneficial use of the property or defeated his reasonable investment–backed expectations to the extent that a taking has occurred. (*Palazzolo v. Rhode Island, supra,* 533 U.S. at p. 618.) "These matters cannot be resolved in definitive terms until a court knows 'the extent of permitted development' on the land in question." (*Ibid.*)

Trafalgar has not submitted any application for development of its Canyon-lands property since the adoption of Measure D, so the County has not had the opportunity to exercise its full discretion in considering Trafalgar's plans for the property in light of the measure. Consequently, Trafalgar cannot state a cause of action for an as–applied taking that is ripe for adjudication.

## IV. Trafalgar's Remaining Causes of Action

Trafalgar contends the court erred in granting judgment on the pleadings on its causes of action for arbitrary planning and zoning and estoppel/impairment of a vested right.

### a. Arbitrary Planning and Zoning

■ An initiative ordinance must be substantially and reasonably related to the welfare of the region affected; it cannot discriminate unfairly against a particular parcel or be arbitrary or capricious. (*Building Industry Assn. v. City of Camarillo* (1986) 41 Cal.3d 810, 824 [226 Cal.Rptr. 81, 718 P.2d 68].) For the same reasons Trafalgar cannot make a facial challenge to Measure D on the grounds the measure does not advance a legitimate state interest, it cannot state a cause of action for arbitrary planning and zoning. Protecting open space and preventing against the ill effects of urban sprawl is, beyond question, beneficial to public health and welfare.

### b. Estoppel

Trafalgar's estoppel/impairment of vested right cause of action alleges that in reliance on pre-Measure-D County policies and initial approvals and direction by County staff, it incurred expenses toward the prospective residential development of its Canyonlands property over a two-and-one-half-year period before Measure D was enacted. The expenses included design, architecture, and engineering analyses and a draft environmental impact report.

■ In the context of land use, the principle of estoppel prohibits a governmental entity from exercising its regulatory power to prohibit a proposed land use when a developer has incurred substantial expense in reasonable and good faith reliance on some governmental act or omission so that it would be highly inequitable to deprive him of the right to complete the development as proposed. (*Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 321 [82 Cal.Rptr.2d 649].) Estoppel can be invoked "in only 'the most extraordinary case where the injustice is great and the precedent set by the estoppel is narrow.' [Citation.]" (*Ibid.*) Estoppel and vested right claims are

essentially synonymous in land use issues, and a developer's right to complete a project as proposed does not vest until a valid building permit or its functional equivalent has issued and the developer has performed substantial work and incurred substantial liabilities in good faith reliance on the permit. (*Id.* at pp. 321–322.)

Trafalgar has alleged only that it received initial County approval for its development project. It has not alleged, nor shown it can amend its complaint to allege, that it has been issued the functional equivalent of a building permit.

*Furey v. City of Sacramento* (1979) 24 Cal.3d 862 [157 Cal.Rptr. 684, 598 P.2d 844] (*Furey*), on which Trafalgar relies, is distinguishable. In *Furey*, a special sewer assessment district was established and installed sewer lines and a treatment facility in an area zoned for agriculture but which the county and city contemplated for transition to urban development. (*Id.* at pp. 866–867.) Plaintiffs' property in the area was assessed more than $1,000,000 for these improvements, and they made payments toward their assessments. (*Id.* at p. 867.) The area was subsequently designated instead for open space and zoned accordingly. (*Id.* at p. 868.) Plaintiffs brought an action for declaratory relief and mandate after the city and county refused to reassess the cost of the improvements and refund the assessments amounts they had paid. (*Id.* at p. 869.) Judgment was entered for the city and county after their demurrer was sustained without leave to amend. (*Id.* at p. 866.)

The Supreme Court reversed, concluding that if the facts were as alleged, plaintiffs should be entitled to relief based on the effect of the general plan amendment and zoning ordinance on their ability to realize the special benefits generated by the assessment district in which they were included and to which they made substantial contributions. Therefore, "if the allegations made in the complaints before us are demonstrated at trial, relief would lie by way of declaratory relief or mandate precluding the application of the subject land–use regulations to plaintiffs." (*Furey, supra,* 24 Cal.3d at pp. 877–878.)

By contrast Trafalgar's property is not, as a result of Measure D, in a new assessment district to which it has become obligated for payments. Because estoppel will not lie when the developer lacks a building permit, regardless of the number of preliminary approvals he has received (*Toigo, supra,* 70 Cal.App.4th at p. 322), Trafalgar cannot state a cause of action for estoppel.

c. *Inconsistency with General Plan*

Trafalgar's complaint contained only the general allegation that Measure D "renders" the County's general plan and the Castro Valley Plan "internally

inconsistent in numerous respects." Its "opening brief" to the trial court elaborated on what it alleged were the inconsistencies created by Measure D. On appeal, it reiterates two[12] of those alleged inconsistencies:

1. The existing Castro Valley Area Plan and the general plan open space element designate the Canyonlands as unique public open space, large parcel agricultural open space, and residential agricultural open space. Sections 13 and 14 of Measure D subject the Canyonlands to the restrictions and policies of the resources management description of the land use designations of the East County Area Plan. According to Trafalgar, "[t]hese policies conflict with existing Castro Valley Area policies governing [the Canyonlands]. Moreover, Measure D does not amend the Open Space Element Land Use Plan to create a new land use category and redesignate these lands to the [East County Area Plan] 'resource management' designation."

2. Section 15 of Measure D amends principle 3.30 of the Castro Valley Plan so that certain areas described in the County's general plan open space element that are in the Castro Valley Planning Area, i.e., the Canyonlands, are subject to the restrictions in the resource management description of the land use designations in the East County Area Plan. Castro Valley Plan principle 3.7 states that very large lot, rural density (typically one acre or more) single residential uses should be located at the periphery of the Castro Valley Urban Area. According to Trafalgar, these two policies are inconsistent because the "resource management" designation requires a minimum parcel size of 100 acres with a single-family home per parcel.

 Section 65300.5 articulates the Legislature's intent that the various elements of a general plan are to comprise an integrated, internally consistent and compatible statement of policies for the adopting agency. This statute requires the *policies* of a general plan to be consistent, not the objectives within its various elements. (*Cadiz Land Co. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 115 [99 Cal.Rptr.2d 378].)

Trafalgar's complaint, containing only a bare conclusory allegation of inconsistency between Measure D and the general plan, does not state a cause of action. Even if its trial brief is characterized as an attempted amendment to its complaint, it does not show inconsistencies.

As to the first purported inconsistency, Trafalgar does not allege, nor can it reasonably be inferred, that the designation of the Canyonlands as unique public or agricultural open space manifests a policy different from the policy

---

[12] Insofar as Trafalgar does not assert on appeal the third inconsistency it alleged below, we deem it abandoned and do not address it. (See *California Recreation Industries v. Kierstead* (1988) 199 Cal.App.3d 203, 205, fn. 1 [244 Cal.Rptr. 632].)

reflected in the resource management requirement of minimum parcel sizes of 100 acres. Both seek to preserve open space. Furthermore, Measure D specifically amends the general plan open space element to state that the Canyonlands are subject to the land use restrictions and attendant policies set out in the resource management designation of the East County Area Plan.

There is also no basis for the second alleged inconsistency between Measure D's amendment to principle 3.30 of the Castro Valley Plan, subjecting the Canyonlands to the East County Area Plan's resource management designation, and principle 3.7 of the Castro Valley Plan. Principle 3.30 is contained in the Castro Valley Plan's general development policies, the fundamental objective of which is to establish a limit on urban development and to minimize the effects of future urban development on open space and environmental qualities.

Principle 3.7 is contained in the Castro Valley Plan's housing/residential land use policies. As Trafalgar observes, it states that very large lot, typically one acre or more, single-family residences should be located "at the periphery of the Castro Valley Urban Area." However, it also states that "[e]xisting large lot residential uses should be maintained in rural areas outside the defined Castro Valley Urban Area. Within these areas, infill on existing vacant parcels may be permitted consistent with service and environmental constraints; further subdivision to create new residential building sites in rural locations should not be permitted."

The Canyonlands lie outside the Castro Valley Urban Area, so restricting lots therein to a minimum of 100 acres is not incompatible with permitting smaller lots in the Castro Valley Urban Area periphery. Such a restriction is also compatible with the Castro Valley Plan's objective of limiting urban development and minimizing the effects of future urban development on open space and environmental qualities.

## DISPOSITION

The judgment is affirmed. Costs are awarded to respondents.

Stevens, J., and Gemello, J., concurred.

The petition of appellants Shea Homes Limited Partnership et al., for review by the Supreme Court was denied October 29, 2003.